

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KHOSRO POURKAVOOS, MD and MARIAM HAKIM-ZARGAR, MD, MA, MPH, FAAOS<br>      Plaintiffs, | CASE NO. 3:17-73 (AVC)<br>HON. |
| v. | |
| THE TOWN OF AVON, DETECTIVE EDWARD ESPINOZA and CHIEF MARK RINALDO<br>      Defendants, | JANUARY 18, 2017 |

## COMPLAINT

Khosro Pourkavoos, MD, (hereinafter "Dr. Pourkavoos") through his attorney, Patrick Tomasiewicz of Fazzano & Tomasiewicz, LLC, brings this Complaint in the United States District Court for the District of Connecticut, and demands judgment against the Defendants Town of Avon, Detective Edward Espinoza, and Chief Mark Rinaldo. In support thereof, the Plaintiff states as follows:

## JURISDICTION

1. This complaint seeks, inter alia, damages pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of Plaintiffs' civil rights.

2. This is an action for damages that exceed $75,000.00 exclusive of interest, costs and attorney's fees.

3. Jurisdiction is founded on 28 U.S.C. § 1331 and 28 U.S.C. § 1343. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

**VENUE**

4.     The acts or omissions giving rise to the Plaintiffs' claims arose in the District of Connecticut and at least one of the Defendants resides in the District of Connecticut.

5.     Thus, pursuant to 28 U.S.C. § 1391, venue is proper in the District of Connecticut.

**PARTIES**

6.     Plaintiff, Dr. Pourkavoos is a resident of the Town of Avon, County of Hartford, and the State of Connecticut and had practiced family medicine at 35 Nod Road in Avon since 2002.

7.     Plaintiff, Mariam Hakim-Zargar, MD, MA, MPH, FAOOS, is a resident of the Town of Avon, County of Hartford, State of Connecticut, and is the spouse of Dr. Pourkavoos. She is the Chairman of the Section of Orthopaedic Surgery and Chairman of the Credentialing Committee at Charlotte Hungerford Hospital.  She is President-Elect of the Connecticut Orthopaedic Society.

8.     At all relevant times, Defendant Town of Avon was a municipality created and existing as a political subdivision of the State of Connecticut pursuant to the laws of the State of Connecticut.

9.     At all relevant times, Defendant Edward Espinoza (hereinafter "Espinoza") was an employee of the police department of the Defendant, Town of Avon, assigned to the Detective Division, acting during the course and within the scope of his employment under the color of law. In this action, Detective Espinoza is sued both personally and in his official capacity.

10.     At all relevant times, Defendant Mark Rinaldo (hereinafter "Rinaldo") was an employee of the Defendant, Town of Avon, and is sued individually and in his official capacity

as Chief of Police of the Town of Avon, and was acting in his official capacity in the performance of his duties and within the scope of his employment as Chief of Police of the Town of Avon, and was acting under color of law.

11.    At all relevant times, as Chief of Police of the Town of Avon Police Department, Rinaldo was and is charged with the management and oversight of the duties and activities of the Town of Avon police officers and detectives, and with the promulgation and enforcement of appropriate guidelines, regulations, policies, practices, procedures or customs thereof.

12.    Each of the Defendants caused, and is legally responsible for, the unlawful conduct, injuries and damages alleged by personally participating in the unlawful conduct, or acting jointly or conspiring with others to act, by authorizing or allowing, explicitly or implicitly, policies, plans, customs, practices, actions or omissions that led to the unlawful conduct, by failing to take action to prevent the unlawful conduct, by failing or refusing to initiate and maintain adequate training or supervision, and thus constituting deliberate indifference to Plaintiffs' rights, and by ratifying the unlawful conduct that occurred by agents and officers under their direction and control, including failing to take remedial or disciplinary action.

13.    In doing the acts and/or omissions alleged, Defendants, and each of them, acted under color of authority and/or color of law at all relevant times.

## PRELIMINARY STATEMENT

14.    This civil rights action encompasses a nightmarish three-year span for the Plaintiff, Dr. Pourkavoos, during which he was subjected to false arrests and an unjustified criminal prosecution, all because an overreaching detective who, despite a lack of experience investigating accusations against physicians, and a lack of medical understanding and

competence, accepted an assignment to investigate this medical case and embarked upon unconstitutional behavior that effectuated a series of false arrests upon the Plaintiff.   This behavior included manipulating witness interviews and leading such witnesses to agree with language suggested by him and the false assertions that he desired.  That detective then repeatedly inserted police-chosen, untrue, inculpatory language in written statements, all to insinuate and conjure up the false image of criminal misconduct, the existence of mens rea and lack of informed consent to the medical examinations alleged. Additionally, intentionally or with reckless indifference, he omitted material exculpatory facts from arrest warrants, failed to include in arrest warrant applications the fact that the Plaintiff experienced no sexual gratification whatsoever from any examination of the witnesses, and failed to note that each and every examination performed was only for a bona fide medical purpose.  In so doing, Espinoza created the illusion of "common themes," and the illusion that the Plaintiff was examining patients for sexual gratification as part of a fictitious modus operandi -- each of which was entirely untrue.

15. As a result of this unconstitutional behavior, misleading arrest warrants were prepared and signed by a judge who was misled by these falsifications, culminating in eleven arrest warrants being returned against the Plaintiff and ultimately obtaining his false arrests on January 22, 2014, and June 4, 2014.  As a result of these false arrests, the Plaintiff's medical practice was destroyed, he lost a base of approximately six thousand (6,000) patients, and he lost his positions with two nursing facilities: The Governor's House in Simsbury and Apple Healthcare in Avon.  As a result of the false arrests, he was also excluded from a panel of insurance plans, and his Family Medicine Board Certification was revoked. After thirty-four (34)

months of litigation, each and every criminal case initiated with the false arrests was dismissed against the Plaintiff on September 22, 2016. During these horrendous thirty-four (34) months, the Plaintiff and his wife suffered tremendously and incurred legal fees and costs in excess of Eight Hundred Thousand ($800,000.00) Dollars, among other financial damages. The Plaintiff lost his entire medical practice. The Plaintiff also suffered the unwarranted suspension of his medical license, loss of earnings, significant public shame, humiliation, anxiety and embarrassment, emotional trauma and distress, loss of standing in the community and irreparable loss of standing in his medical community.

16.     On or about January 16, 2014, Espinoza presented sworn affidavits in separate arrest warrants to the Connecticut Superior Court, alleging that the Plaintiff in this matter, Dr. Pourkavoos, had performed what Espinoza unconstitutionally claimed were not bona fide medical examinations on two patients (hereinafter "Patient #1 and Patient #2") in the course of routine and documented medical appointments. As a result, on January 21, 2014, with respect to Patient #1, the Plaintiff was charged with sexual assault in the second degree in violation of C.G.S. § 53a-71(a) (7), a Class C Felony, and sexual assault in the fourth degree in violation of C.G.S. § 53a-73 (a) (5) a Class A Misdemeanor. With respect to Patient # 2, on January 21, 2014, the Plaintiff was charged with two counts of Sexual Assault in the Fourth Degree in violation of C.G.S. §53a-s73 (a) (5).

17.     The Plaintiff was arrested at his office on January 22, 2014, by Espinoza and incurred the expenses associated with the payment of surety bonds in each case in the amount of $75,000.

18.     The arrest warrant affidavits in each case materially mischaracterized available

information, misrepresented the content of complaining witnesses' testimony, omitted material

exculpatory information demonstrating that any treatment and evaluation, including physical

examinations, performed by Dr. Pourkavoos were medically justified and necessitated by the

patient's chief complaints and presenting symptoms, and were, thus, medically appropriate.

Espinoza, therefore, unconstitutionally denied the Court the opportunity to make an informed

probable cause determination in accordance with the Article First Section One of the

Constitution of the State of Connecticut and the Fourth Amendment to the United States

Constitution.

19.    Immediately after these initial unconstitutional false arrests of the Plaintiff based

upon the tainted warrants, a number of local news media organizations, including newspapers

and television stations, reported on the arrests and the false allegations of the tainted arrest

warrants were widely publicized throughout news channel websites, televised reports, Google

search results, and other means. As a result of those reports, from the practice's pool of

approximately six thousand (6,000) patients, several additional patients contacted Espinoza with

a diverse set of expressed concerns and uncertainties about their own treatment. With the

exception of one single patient, who was suffering from long-standing schizoaffective disorder

requiring high-dose psychotropic medications, *none of these patients* had ever previously

expressed or filed any complaint concerning their care, whether with an insurance company,

state agency or police department, nor with the Plaintiff related to the Plaintiff's care and

treatment. It was not until the Plaintiff was unconstitutionally and falsely arrested, causing an

explosion of adverse sensationalistic news via various media, that these purported concerns and

questions arose. In fact, the one prior complaint of that one single patient with schizoaffective

disorder, had been received by CHN, the Connecticut Health Network, and was found to be without merit after it was evaluated by CHN's trained staff.   Even during the intake process, CHN educated this particular patient concerning the medical propriety of a particular type of examination, closed the case, and sent a resolution letter to the patient, all prior to the Plaintiff's arrest.

20.     After his initial unconstitutional and false arrests of the Plaintiff, Espinoza then sought an additional nine arrest warrants by employing the same flawed, and unconstitutional methods outlined in Paragraph 16, creating the illusion that the Plaintiff was a sexual predator. As a direct result of Espinoza's illegal behavior, he prepared nine additional unconstitutional warrants that were signed by the prosecutor and judge.   These subsequent arrest warrant applications, like the initial applications, materially omitted the readily available exculpatory information that established the absence of probable cause to believe a crime had been committed.   Deprived of this information, the Court issued the subsequent arrest warrants on May 28, 2014.   On each warrant, surety bonds were set in the amount of Twenty-Five Thousand ($25,000.00) Dollars.   As a result of these false arrests, the Plaintiff's professional and personal life was taken apart at the seams.

21.     Espinoza asserted the existence of probable cause despite his lack of knowledge or understanding of standards for medical evaluation and treatment; and, Espinoza failed to consult with any physician to assist in the interpretation of the medical records and the medical information pertinent to the evaluation and treatment of each of the these patients.   As a result, each of the warrant affidavits omitted information material – and indeed critically necessary – to the Court's probable cause determination, mischaracterized and falsified patient statements

chiefly through results-oriented leading questions or outright insertions of words he preferred, and ultimately mischaracterized the very substance of the recorded patient interviews in the preparation of the arrest warrants.

22.     The initial arrest warrant affidavits, as well as the subsequent affidavits, each omitted this material information about the complainants' necessary and appropriate medical care that the affiant possessed and reviewed, which, if provided to the judge, would have compelled a finding that probable cause was lacking as to essential elements of the crimes charged.  Had Espinoza not materially mischaracterized the totality of information available to him at that time, he would not have been able to effectuate these false arrests.

23.     Thirty-two (32) months after the first two arrests and twenty-seven (27) months after the second group of arrests, in September of 2016, an expert physician hired by the State of Connecticut examined a set of medical records selected by the State of Connecticut in order to determine if those patients' presenting symptoms and complaints did, in fact, warrant the medical evaluations and examinations undertaken by the Plaintiff.  After a joint meeting between expert physicians employed by the State of Connecticut and the Plaintiff, the State of Connecticut made its own independent decision to drop all of the pending criminal cases resulting in a full dismissal of all of the criminal charges on September 22, 2016.

24.     This dismissal of the cases came after the Plaintiff endured three years of severe and extreme pain, agony, humiliation, anxiety, shame, emotional distress, loss of reputation, destruction of his medical practice, and financial devastation.

## COMMON ALLEGATIONS OF FACT

25.     On or about June 27, 2013, a female individual (Patient #1) came to the Avon

Police Department claiming that she was the victim of a sexual assault by her physician, Dr. Pourkavoos, that had occurred at his office.

26.     On July 8, 2013, upon Espinoza's insistence, she returned to the Avon Police Department for the purpose of providing a sworn written statement.

27.     Espinoza claimed that on July 28, 2013, Diane Cybulski, a supervising investigator at the Connecticut Department of Public Health (DPH), informed him that the DPH agency did not have a specific medical doctor on staff to serve as a consultant to determine if the standard of care had been met during examinations of patients.  Notwithstanding knowledge that a physician consultation was routinely expected on standard of care issues, much less on whether alleged criminal conduct was, in fact, part of bona fide medical care and necessary for patient treatment, Espinoza failed to inform the Court of this fact when he prepared and signed arrest warrants for review and approval of the Court.  In fact, he drove forward with his investigation *without ever* consulting any medically trained expert witness, ultimately causing the two false arrests of the Plaintiff on defective arrest warrants.

28.     On or about August 9, 2013, in the middle of the afternoon, Espinoza entered the Plaintiff's medical practice on an unannounced basis with a search warrant to seize Patient #1's medical chart.  Espinoza seized Patient #1's chart.  Dr. Pourkavoos was told that if he did not consent to an interview that afternoon at the Avon Police Department, his office medical records computer also would be seized by Espinoza.  Based upon this threat and the fact that the seizure would paralyze his medical practice, the Plaintiff went to the Avon Police Department that afternoon and participated in an interview related to Patient #1.  Despite Espinoza's tactic of exerting tremendous psychological stress on Dr. Pourkavoos by continually increasing the force

and pressure of false accusations during a manipulative, accusatory so-called interrogation, the Plaintiff repeatedly denied the allegations against him and emphatically and repeatedly stressed to Espinoza that he was not guilty of any wrongdoing and that any medical treatment and examination provided to Patient #1 was done for a bona fide medical purpose. This conversation with the Plaintiff, a physician in good standing licensed by the State of Connecticut, was the only consultation Espinoza ever undertook at any time with any physician.

29.     In August of 2013, he identified two sisters (Patients #2 and #3) who were patients of Dr. Pourkavoos. Espinoza located them after seeking information from the Department of Public Health regarding Dr. Pourkavoos. After learning that Dr. Pourkavoos' license to practice medicine in Connecticut was in good standing for over a decade, with no disciplinary issues of any kind, Espinoza tried to locate any other information from DPH that he might use to seek to arrest Dr. Pourkavoos. DPH located a lay website named Wellness.com that purported to be a physician evaluation site. Espinoza applied for and obtained an ex parte search warrant for the holder of an account from which the one anonymous inflammatory remark against the Plaintiff had originated, whose account holder was revealed to be the stepmother of the two sisters. Upon information and belief, these two sisters had never approached any insurance company, DPH, or the police relating to the care and treatment they had received from the Plaintiff – Espinoza, on his own, made it his purpose to locate and find them. The two sisters were subjected to separate recorded interviews conducted by Espinoza who utilized leading questions, mischaracterized their statements, and inserted information containing untrue language.

30.     According to an affidavit signed in August of 2016 by Stanley Peck, who was

employed for 24 years by DPH and who supervised the prosecution of complaints against a wide

variety of health care providers, including physicians, a proper police investigation of sexual

misconduct on the part of a physician requires that "open-ended not leading questions be asked

so that a witness/complainant is allowed to tell his or her story in an unprompted manner."  Mr.

Peck was an expert witness for the Plaintiff in the underlying criminal case.  Additionally,

according to Mr. Peck, proper investigative methods in the investigation of a physician are

"designed to insure that investigations were conducted in a fair and objective manner to arrive at

reliable conclusions and comply with requirements of due process."

      31.    Espinoza did not review *or even obtain* the medical records of these two patients,

or consult with anyone with any medical education, training or experience relating to the medical

treatment provided by the Plaintiff, before applying for and obtaining two arrest warrants for the

Plaintiff.

      32.    Had Espinoza followed customary law enforcement procedures, he would have

obtained and reviewed the medical records of these two women before arresting the Plaintiff.

Had he done so, he, among many other exculpatory facts, would have determined that the

stepmother of the two sisters had, in fact, contacted the Plaintiff's office the same day that she

posted on the lay website the inflammatory remarks referred to above to schedule a follow up

appointment with Dr. Pourkavoos for care and treatment of one of her daughters.

      33.    On or about October 4, 2013, per Espinoza's instruction, these two sisters (Patient

#2 and Patient #3) submitted themselves to separate police interviews.  During the interview of

Patient #2 by Espinoza and another officer, the patient was intimidated with the statement that

her anonymity could be jeopardized if she remained only a witness, but it would be protected if

she agreed to press charges, after which Patient #2 agreed to press charges. Notwithstanding the threat to Patient #2, Patient # 3 declined to press any charges against the Plaintiff.

34.     The initial warrant affidavit represented that about three (3) months prior to Patient #2's and Patient #3's interviews,  Patient #1 had claimed to Espinoza that she had visited Dr. Pourkavoos' office in June 2013 to review  "recent blood work."

35.      From reading Dr. Pourkavoos' contemporaneous medical records of treatment of Patient #1 and from Dr. Pourkavoos' extensive explanation at the police station, and from Patient#1's interview, Espinoza knew or should have known that the visit on June 26, 2013, was not as indicated by Patient #1, chiefly to review "recent blood work"; rather, the patient had visited the doctor's office for the following chief complaints and symptoms: hair falling out, anemia, increased weakness, increased fatigue,("I slept for two days and just could not get out of bed for almost a week. Just very weak and my legs would fall asleep and for like 45 minutes, like paralysis"),  low back pain, bruisability, severe constipation, decreased vitamin D levels, degenerative disc disease, hypomagnesemia, and bleeding easily.

36.     Patient #1 alleged that in this appointment she was asked to remove her clothes for a spinal examination.  Then, she was asked if she had been constipated; and that Dr. Pourkavoos, for the purpose of evaluating her constipation, performed a rectal examination moved his fingers and told her that she was very constipated: "Yeah you're really bound. It's hard. Wow do you get bloody stools."

37.     The initial warrant affidavit represented further that the patient alleged she had visited Dr. Pourkavoos' office on an earlier occasion in May 2013 because of a skin rash, and that during the examination for the skin rash Dr. Pourkavoos had "asked [her] to remove all of

her clothing … [and] then fondled [her] buttock [sic] and breasts inappropriately."

38.     However, the warrant misrepresented facts known to Espinoza including the fact that in her recorded interview with Espinoza she never uttered the word "fondled," rather, Espinoza himself selected the word "fondled" and told her : "I want to change this [the written statement] to I, I was told to take off all of my clothing….I made a lot of *mistakes*.  Dr. Pourkavoos proceeded to examine me by touching and fondling my buttocks and breasts."

39.     In addition, the medical records for the May 20, 2013, office visit reflected that Patient #1 had complained of a history of low back pain and was diagnosed on that visit with the same.  Also, in her recorded interview, Patient #1 stated she had scoliosis, degenerative discs, spinal stenosis, had undergone spinal fusion, had sciatica and her legs frequently would fall asleep for "45 minutes, like paralysis." "It [the paralysis] happens to me, you know, a lot." She stated that the Plaintiff "was looking at my back and was pushing down here and he said my sciatica on my lower butt, kept pushing around and asking me if I feel pain anywhere…". Patient #1 described the manner of the examination as "pushing" on seven (7) separate occasions during the recorded interview.

40.     Espinoza deliberate insertion of the word "fondling" into the affidavit, rather than using the patient's own choice of words "pushing" demonstrates a conscious decision to create the appearance of impropriety, when the patient's own description supports the performance of a medically appropriate examination.

41.     The written statement was prepared by Espinoza personally contemporaneously with the recorded interview.

42.     As mentioned above, the initial warrant affidavit alleged that during this

interview, the patient also claimed she "could feel [Dr. Pourkavoos'] fingers moving in a strange sexual manner" although the patient in her recorded interview not once uttered the word "strange" and never stated that the examiner's fingers were "moving in a strange sexual manner."

43.     At the conclusion of this recorded interview, Espinoza, not the patient, drafted her written statement and in doing so selected words that mischaracterized the patient's statements, added words that materially altered the rhetorical context and the substance of the patient's statements and omitted her exculpatory statements.

44.     As to Patient #1, Espinoza's initial warrant affidavit omitted the significant exculpatory information in his possession that amply demonstrated the existence of a bona fide medical purpose for the alleged examinations.

45.     Espinoza also omitted the documentary evidence contradicting Patient #1's account of events that if included would have demonstrated that his examination of the patient was clearly medically indicated and was for nothing other than a bona fide medical purpose. Also, per chart documentation, on April 8, 2011, during her first office visit, the patient had reported that, among a number of psychiatric disorders, she suffered from *paranoia*. This fact is significant since making false accusations frequently accompanies paranoia.

46.     Apart from suffering from *paranoia,* she reported that she had no relationship with her mother and had a history of childhood sexual abuse, childhood physical abuse, a history of multiple significant childhood physical traumas, and had a history of narcotic addition and was receiving Suboxone from TIMEOUT, the narcotic treatment program of the Connecticut Department of Correction. These misleading omissions materially misinformed the Court regarding the credibility of Patient #1 and, thus, deprived the Court of the opportunity to

make an informed probable cause decision.

47.     These acts and omissions deprived the court of an adequate opportunity to determine that no arrest should have been made related to Patient #1.

48.     Said affidavit, additionally mischaracterized, inaccurately stated and omitted material facts as to Patient #1 in the following manner:

a.  At no time during Patient #1's recorded interview with Espinoza did she ever describe any contact by the Plaintiff as "fondling" nor did she ever allege that the Plaintiff "fondled" any part of her body.  Rather, her own description of the medical examination of her breasts was that it involved "squeezing" and that, upon the patient's own report of having fibrocystic breast disease and a "lump" in her breast, allegedly culminated in the doctor diagnosing a lump in her left breast and advising the patient of this condition and recommending a referral to another physician;

b.  In that Espinoza failed to include evidence in the initial arrest warrant that not only was the principal complainant a documented drug user, convicted of forgery (a crime of deception), who left rambling and incoherent voice messages for the investigating officer during the course of the investigation that prompted Detective Espinoza's own suspicion of her drug use, but also her documented medical history and the contemporaneous records of her visits to Dr. Pourkavoos' office established that she was not truthful in her interview with police;

c.  In July of 2005 the patient was arrested for forgery in the second degree, arising from her alteration of date of prescription in attempts to have it filled in two different pharmacies, lying to the pharmacist about changing the date and, in doing so, violated the treatment contract with her doctor and the doctor refused to treat her after that date. She was convicted of forgery 2nd which is a Class D felony.

d.  In neither her recorded interview nor even in the written statement prepared by Espinoza, did Patient #1 ever state that she could feel Dr. Pourkavoos move his fingers in a "strange sexual manner" as represented in the affidavit;

e.  At no time did Patient #1 ever describe the doctor's examination as "sexual" in nature. Rather, Espinoza deliberately inserted the word "sexual" into the affidavit to urge a finding of probable cause with an illegal misrepresentation, with no understanding whatsoever about how a medical

doctor properly performs a digito-rectal examination or breast examination for a bona fide medical purpose;

f.  Patient #1  presented to his office on June 26, 2013, chiefly not to "review recent blood test results" as averred by Espinoza but, in fact, visited the doctor's office for the following chief complaints and symptoms: hair falling out, increased weakness, increased fatigue, low back pain, bruisability, severe constipation, decreased vitamin D, degenerative disc disease, hypomagnesemia, and bleeding easily;

g.  It omitted Patient #1's own statements: (i) acknowledging her history of blood in her stool prior to the alleged digito-rectal examination, and (ii) in which she told Espinoza that Dr. Pourkavoos communicated with her about this medical history as the reason for the alleged digito-rectal examination, i.e., the evaluation of gastrointestinal bleeding; medical information that would have precluded a finding that Dr. Pourkavoos' alleged examination was not for a bona fide medical purpose;

h.  It omitted that given the patient's history of constipation, chronic blood in her stool, family history of colon cancer, and "annemia" (sic) as Espinoza personally hand wrote into Patient #1's signed statement, that a rectovaginal exam would have been justified;

i.  It omitted that in response to Espinoza's leading question regarding having a sexual relationship with the Plaintiff, the patient vehemently denied and told Espinoza that no sexual relationship had occurred between herself and the Plaintiff and that the Plaintiff's behavior "*was very professional*";

j.  It omitted that the patient told Espinoza that "he [the Plaintiff] really was good, he really was.  He was thorough and good…";

k.  It omitted that the patient had behaved in an unusual manner as a patient delivering on October 22, 2012, a rendition of "Minnie Mouse" in sketch form to the plaintiff's office in a gesture of gratitude signed "By :) ME" with the letter i's dotted in the shape of a heart.  Espinoza had been alerted by Dr. Pourkavoos that this unusual document in the miscellaneous section of the chart was evidence of psychopathology and was kept for the sole purpose of maintaining complete and accurate documentation.  Espinoza had been told by Dr. Pourkavoos "knowing that her history, her psychiatric history…that's somebody that's not normal, that would give you that drawing…everything that comes in the chart for medical, legal reasons, we keep.  I keep everything…it's the law.  You have to keep all records";

l.  It omitted that the Plaintiff referred the patient to three other doctors after

the June 26, 2013, appointment.  It also omitted that the Plaintiff had referred the patient to multiple gastroenterologists for the evaluation of her gastrointestinal bleeding, but upon information and belief she had remained non-compliant;

m. It omitted that the patient never stated to the police that there was any sexual gratification experienced by the Plaintiff during the course of his examination;

n. It omitted that in addition to bi-polar disorder, post traumatic stress disorder and attention deficit disorder, that the patient suffered from "*feeling paranoid,*" history of childhood sexual abuse, childhood physical abuse, "had addiction to Oxycontin," emotional breakdown, obsessive compulsive disorder; and also a history of significant previous physical trauma: at the age of one year, she was run over by a car and was hospitalized for months; at the age of two years she fell  from the second story, at the age of 16 she was in a car accident and was only found forty-eight (48) hours later;

o. It omitted that the Plaintiff had provided a polygraph report demonstrating that the Plaintiff had passed a polygraph test;

p. It omitted that Espinoza was requested by the Plaintiff's attorney to include the copy of the polygraph report as a part of the arrest warrant application;

q. It omitted that Patient #1 had admitted to having a poor "memory" during the recorded police interview with Espinoza;

r. It omitted that Patient #1 reported, that she had been prescribed the following psychotropic medication that affect memory and attention by her psychiatrists: Seroquel SR (an atypical antipsychotic for the treatment of schizophrenia, bipolar disorder, and major depressive disorder), Abilify (an atypical antipsychotic for the treatment of schizophrenia, bipolar disorder, and major depressive disorder), Lamictal (a mood stabilizer for bipolar disorder), Trileptal (another mood stabilizer for bipolar disorder), Adderall (an amphetamine), Paxil, Zoloft, Xanax (a benzodiazepine), and Suboxone (an opioid derivative used to treat opioid addiction, prescribed by TIMEOUT, the addiction treatment branch of the Connecticut Department of Corrections);

s. It omitted reference that Patient #1 was sexually abused as a child. This fact is significant since childhood sexual abuse is associated with increased likelihood of psychiatric disease;

t. It omitted that physicians are not required by law to have chaperones in an

examination room and it omitted that no DPH rules exist in the State of Connecticut regarding the presence or absence of chaperones;

u. It omitted that Patient #1 had told the police that she previously suffered a mental breakdown "where she could not talk";

v. It omitted that Patient #1 told Espinoza that she left her previous doctor because she had told him "I think you need a mental doctor";

w. It omitted that Patient #1 never stated to Espinoza that her buttocks were "fondled" during the May 20, 2013 examination;

x. It omitted that the statement in the warrant "examined her vagina by spreading her vagina open" misquoted Patient #1 who actually attempted to correct her previous statement regarding "spreaded my vagina" during the interview with Espinoza by stating "It's not my vagina, I don't know." The warrant also omitted that Espinoza at this juncture interrupted Patient #1 and stated "Yeah, you don't have to be specific" even though Patient #1 had attempted to be specific as to the location where she had been examined ("outer lips") which indicated that no penetration had ever occurred.

y. In that paragraph 7 of the warrant stated that Patient #1 "told Dr. Katz that she did not say anything to Dr. Pourkavoos when this happened because she was shocked and not sure how to react." Patient #1 actually stated to Espinoza, according to his report, the exact opposite: "she did not say anything to Dr. Pourkavoos when this happened because she was *not shocked*";

z. It omitted that Patient #1 described to Espinoza an examination consistent with a routine sciatica evaluation where the Plaintiff was pushing on the middle of the gluteal region to locate the area of the reproducible sciatic nerve pain, while asking the patient "where it hurt";

aa. It omitted that the medical records from May 20, 2013, demonstrated that Patient #1 had a history of low back pain, degenerative disc disease, lumbar fusion with nerve damage, and left leg pain, clearly justifying the examination of her lumbar spine and sciatic nerve;

bb. It omitted that Patient #1 was hesitant to swear and sign the affidavit and instead asked Espinoza with respect to how someone could prove "if I'm lying and making it up then I get in trouble, but how are you gonna prove it 'cos it's like word against word";

cc. It omitted the reasons underlying why Patient #1, upon her discharge from

the psychiatric hospital, sought sexual assault group meeting and counseling at the Susan B Anthony Project in February 2013, which was four (4) months *before* accusing the Plaintiff of sexual assault;

dd. It omitted that in May 2005 the patient had accused a third party of stealing her pills.  She had in her possession ninety-four (94) Oxycontin tablets in a pill bottle along with her antidepressant, Lexipro;

ee. It omitted information in a police report that Espinoza had in his possession in August of 2013 that Patient #1 accused a third party of stealing her pills, and that accusation had not been substantiated. The results of that report also would have brought into question the credibility of Patient #1;

ff. It omitted that two letters dated September 13, 2013, and October 8, 2013, were sent by counsel of record for the Plaintiff containing the exculpatory information, in part, outlined in this Complaint, which were not presented to the Court despite counsel's request;

gg. It omitted that in addition to the suicide gesture in February 2013, which was triggered by a "crisis in her marriage" and led to her subsequent involuntary psychiatric hospitalization where she made false statements to the hospital staff, per Espinoza's own report, on July 30, 2013, she admitted to Espinoza that her husband wanted a *divorce* and, accordingly, she possessed a secondary motive for making a complaint;

hh. In addition to these errors and omissions, prior to the Plaintiff's false arrests, Espinoza, nor any member of the Avon Police Department ever consulted with a physician or medical expert to inform themselves that the examinations performed by Dr. Pourkavoos were medically indicated and necessary and customary and, thus, clearly not determinative evidence of sexual assault; and

ii. Espinoza omitted to inform the court that he had reviewed online news and information regarding other Connecticut physicians charged with sexual assault, including information regarding Edwin Njoku. This omission deprived the court to consider the possibility of an investigation tainted by investigator bias and an arrest warrant affidavit similarly tainted by information and accusations harvested from above-mentioned online sources.

49.    Had Espinoza properly investigated this case, he would have learned from expert opinion that all evaluations, treatments and procedures done by the doctor were for a genuine

bona fide medical purpose given each patient's individual clinical context.

50.     With respect to the arrest warrant for Patient #1 described in the previous paragraphs, it contained additional statements made by Patient #2 and her sister (hereinafter "Sister"). These statements will be discussed hereinafter and are also equally subject to many omissions and similar unconstitutional infirmities described hereinbefore.

51.     With respect to the arrest warrant for Patient #2 dated January 16, 2014, Espinoza represented that in February of 2013 Patient #2 complained of lower back pain and that Dr. Pourkavoos touched her buttocks and asked about the location of her pain.

52.     The affidavit proceeded to state that "Dr. Pourkavoos proceeded to pull down her pants partially exposing her buttocks," and "Dr. Pourkavoos continued to examine her lower back and buttocks, and again, without notice, pulled her pants down further exposing her entire buttocks."

53.     Espinoza personally hand wrote on behalf of the patient, "Dr. Pourkavoos proceeded to examine me by touching and fondleing (sic) my buttocks and breasts," and represented in the arrest warrant, "Dr. Pourkavoos then used both hands to touch and fondle her buttocks ... [and] spread the cheeks of her buttocks apart."

54.     Espinoza asserted in this affidavit that the patient "made another  appointment in May of 2013 because of an allergy that had produced a rash on her arms...[and] Dr. Pourkavoos asked if the rash was present in other areas ... . [She] told Dr. Pourkavoos that the rash develops in areas where she sweats but that at this time the only other place the rash was present was on her upper stomach."

55.     The affidavit goes on to state that, according to Patient #2, Dr. Pourkavoos

expressed concern that the patient's rash could possibly be due to a latex allergy, and the doctor

then "lifted her bra exposing about half of her breasts … [and] touched the lower half of her

breasts," and "proceeded to pull down [the patient's] pants exposing her genitals … [and] [t]hen

touched and examined the top of the genital and hip area."

56.     In a fashion similar to the misrepresented allegations concerning the first patient,

the initial warrant affidavit also misrepresented the statements of Patient #2.

57.     Said affidavit, additionally mischaracterized, inaccurately stated and omitted

material facts as to Patient #2 in the following manner:

a)   It omitted that Espinoza *never reviewed or even obtained* the medical
     records pertaining to Patient #2 or her Sister prior to arresting the
     Plaintiff; accordingly, without the records he could not have made an
     assessment in good faith that no bona fide reason existed for the medical
     evaluations and physical examinations of either sister;

b)   At no time during the recorded interview did Patient # 2 ever
     spontaneously state that Dr. Pourkavoos "fondled" her buttocks. Rather,
     repeatedly the patient described Dr. Pourkavoos' medical examination as
     consisting of "pushing" relative to complaints made by Patient #2 of
     sciatica pain radiating to her buttock and down her leg;

c)   The patient, on fourteen (14) occasions during her interview with
     Espinoza, used the word "pushing" and did not use the word "fondling"
     in her spontaneous description of the manner of the medical examination
     where the doctor concurrently was questioning the patient about radiation
     of the pain to the leg. Rather, in response to the patient's statements,
     Espinoza asked the following leading question: "[f]ondling?" to which
     the patient replied: "Touching my butt really. I mean, it was like pushing
     on my butt cheeks almost like he was fondling my butt cheeks." With
     this pretext, Espinoza inserted the expression "touch and fondle" into the
     affidavit, rather than using the patient's own clear description and choice
     of words, "pushing," which described the true manner of the medical
     examination of the sciatic nerve in the sciatic notch;

d)   In failing to disclose that an appropriate examination for Patient #2's
     back pain, sciatica, gluteal pain and leg pain would necessarily include
     examination of the lumbar spine as well as the sciatic nerve which would

require palpation of the gluteal area, and was, therefore, medically necessary to properly evaluate the patient's low back pain that was radiating to the gluteal area and down the leg given the medical context;

e) In failing to provide in the warrant that Dr. Pourkavoos' examination of Patient #2 was for a bona fide medical purpose;

f) In failing to include that the Patient #2 had, in fact, reported in the interview that she was suffering from "severe seasonal allergies" and intermittently developed a "pretty bad" "*full body rash*" and not just a "rash on arms" as misrepresented in the warrant affidavit prepared by Espinoza;

g) In failing to include information from the contemporaneous medical records on May 17, 2013, that reflected the patient's complaint of a rash on both arms/antecubital areas, itchy nose and eyes, elbow hives, and an occasional itch under the latex elastic band of her underwear in addition to the patient's past medical history which included allergic rhinitis, allergic conjunctivitis and a history of food allergy (apples, plums, soy, pineapples and kiwis). This information would have demonstrated that the examination of the patient's skin under the breasts in the area of the elastic band of the bra and the skin of the lower abdomen and the crease of the legs in the area of the elastic band of the undergarment/underwear was necessary due to the medical concern for latex allergy, contact dermatitis and eczema, given the clinical context which was omitted from the affidavit;

h) It also failed to include that Patient #2 stated "I said that I get it [the rash] right about here and sometimes in my lower stomach and my lower back and basically anywhere I sweat. So, but I never said my boobs specifically. I guess he was just assuming that I sweat underneath my boobs...." This statement reveals that at the time of the examination in May of 2013, before Espinoza's intervention in October of 2013, Patient #2 deemed and believed the examination of the skin under her breasts to have been medically motivated and based on the clinical assumption of perspiration in the skin folds under the breasts, and in no way predatory in nature.

i) It also failed to note that Patient #2 informed Espinoza that the palpation of the rash was part of the skin examination. It was to ensure not to miss a rash that could be palpated but could not easily be visually discerned: "was feeling above the top part of my crotch to see if there was any bumps that maybe he couldn't see, maybe he could only feel....He wanted to make sure that there wasn't any [rash] there from when I was

wearing underwear and maybe it was something left over and he even wrote on the diagnosis possible latex allergy…."

j) It failed to note that Patient #2 received a prescription for triamcinolone cream, a synthetic steroid cream with anti-inflammatory and anti-pruritic properties, to alleviate the allergic rash that she would intermittently develop in the creases of her legs, lower abdomen, and lower back;

k) It omitted that the Plaintiff had diagnosed and documented a possible latex allergy after his examination of Patient #2, and the Patient #2 in fact clearly communicated this discussion about the potential diagnosis of a latex rash, that occurred between her and her physician, with Espinoza during the recorded interview;

l) It omitted that in her recorded interview, Patient #2 posited the reason why the Plaintiff did not wear gloves during the skin examination and told Espinoza, "maybe it was because of my latex allergy";

m) It omitted that following Patient #2's February 2013 office visit, she returned to the Plaintiff's office in September of 2013 for a routine visit complaining of urinary frequency, dysuria, UTI, low back pain, sponsylolysis, muscle spasms, and facet joint arthritis. This reveals that in September 2013, before Espinoza's intervention in October of 2013, Patient #1 specifically still entrusted Dr. Pourkavoos with the evaluation of her bladder symptoms, which would possibly require the examination of her bladder and pelvic organs, over her already established gynecologist;

n) It omitted that following Patient #2's May 2013 visit involving her rash, she returned to the Plaintiff's office for two additional routine appointments in July of 2013 and September of 2013, and not just one office visit, as the affidavit asserts;

o) In failing to include in the warrant affidavit medically significant information described by the patient in her recorded interview with Espinoza. Specifically, she explained that during the alleged examination of her back she complained to Dr. Pourkavoos that her pain "shoots into [her] butt and down [her] leg…" and further, that when she identified a location for the pain, "[Dr. Pourkavoos] pushed on that spot and then he pushed back down because I did tell him that it was shooting, the nerve was shooting down my butt into my leg." As submitted to the Court, however, the affidavit said only that the patient complained of back pain, "explained and pointed to her lower back" and that during the alleged examination "told Dr. Pourkavoos that the pain was located *higher*" but

that "Dr. Pourkavoos continued to examine her lower back and buttocks." This material omission created the false impression that Dr. Pourkavoos disregarded the patient's complaints and instead examined her buttocks for no medically valid reason, when in fact the patient herself clearly identified her "butt" and "leg" as the site of the shooting pain. This description of the sciatica and left leg pain was also clearly documented in the patient's medical chart;

p) In omitting the patient's admission that during the examination of her rash, Dr. Pourkavoos explained to her that an examination of the area underneath the breasts was necessary to determine if any latex rash existed in that location; this was an explanation that Patient# 2  was able to recount even five months after the examination when she was being interviewed by Espinoza;

q) It omitted that Patient #2 attended twenty (20) office appointments between the time frame of July 2011 and September of 2013 with the Plaintiff involving symptoms and complaints of low back pain with the exception of one visit on October 17, 2011, and further omitted that four (4) of these twenty (20) visits were after the February 2013 visit;

r) It failed to state in the warrant that Patient #2 told Espinoza that her former doctor also in a similar fashion used a thumb to press on her buttock to evaluate her sciatic nerve;

s) Had Espinoza obtained the chart and consulted a physician he would have learned that the patient received eighteen (18) prescriptions for pain medications from the Plaintiff which could have been evidence of drug seeking behavior and doctor-shopping which could have been easily further investigated through the Department of Consumer Protection State of Connecticut "Patient Rx History Report"; and

t) In addition to these mischaracterizations, errors and omissions, prior to the Plaintiff's false arrests,  neither Espinoza nor any member of the Avon Police Department ever consulted with a physician or medical expert to inform themselves that the examinations performed by Dr. Pourkavoos were medically indicated and necessary and customary and, thus, clearly not determinative evidence of sexual assault.

58.    These misrepresentations, additions and omissions on the part of Espinoza served to create a false appearance of criminality, when the patients' own descriptions support the performance of a medically necessary and appropriate examination.

59.     Patient 2's Sister also was subject to a recorded interview by Espinoza on October 4, 2013.

60.     Statements attributed to the Sister were added to both warrants to ensure or increase the likelihood that probable cause was falsely found.

61.     In the warrant, Espinoza averred that he was told by Sister that she had two appointments with the Plaintiff that made her very uncomfortable.

62.     The first appointment occurred in February of 2013.

63.     At that time, according to both warrants, Sister made an appointment for a "scar" on her wrist.

64.     According to the warrant, the Plaintiff asked about "any further medical issues" and Sister told the doctor she had a birth mark on her back.

65.     According to the warrant, the Plaintiff asked her to remove her sweatshirt.

66.     According to the warrant, the Plaintiff examined her back and inquired about "any further medical issues."

67.     According to the warrant, Sister stated "no."

68.     According to the warrant, the Plaintiff continued with his examination. During the course of the examination he touched Sister's upper chest area, and then lifted up each side of her bra exposing her nipples.

69.     Using additions, omissions, and mischaracterizations, the warrant drafted by Espinoza pertaining to Sister created an untrue and spuriously salacious picture of the doctor's medical care and this office encounter.

70.     According to the warrant, Sister had a second medical appointment with the

Plaintiff.

71.     The appointment occurred "two to three months later."

72.     At that time, according to the warrant, Sister was "sick with what she believed

was bronchitis."

73.     According to the warrant, while using the stethoscope, Plaintiff moved the

stethoscope lower towards her breasts, and the Plaintiff, without saying anything, proceeded to

lift up her bra with one finger fully exposing her breasts and then continued the examination with

the stethoscope touching the top of areas of Sister's breasts.

74.     Said affidavit, additionally mischaracterized, inaccurately stated and omitted

material facts as to the Sister in the following manner:

a)  In that it omitted that Espinoza never obtained or even reviewed the medical
    records relating to Sister prior to arresting the plaintiff;

b)  Had he obtained and reviewed the records, he would have discerned that the
    Sister did not make an appointment in February of 2013 to have a "scar"
    evaluated.  Instead, she made the appointment to "review labs [that had been
    done in] 1/2013";

c)  In fact, during Sister's recorded interview she informed Espinoza that she was
    treating with the Plaintiff for a "blue dot" (a suspected melanoma) which was
    at that time affecting her nerves, and therefore, painful, and not just a "scar";

d)  In fact, during the recorded interview Sister stated that "he said okay I want
    you to get it removed.  That's why I have a scar there because I went to the
    doctor after that and I got it removed";

e)  Had Espinoza obtained and reviewed the records, he would have seen that in
    March of 2013 Dr. Pourkavoos had meticulously documented in the Sister's
    chart "five millimeter pigmented lesion over the radial aspect of the wrist
    associated with new onset pain that was radiating from the wrist to the first
    interdigital web space. Question of MELANOMA. Important";

f)  Had he obtained and reviewed the records, he would have determined that the
    patient was referred to a dermatologist for removal of the lesion on March 28,

2013;

g)  Had he obtained and reviewed the records, he would have determined that the Plaintiff's staff made an appointment on behalf of the Sister with a dermatologist at the University of Connecticut on April 1, 2013 at 11:00 a.m.;

h)  Had he obtained and reviewed the records he would have determined that the lesion had been excised sometime between her last office visit with Dr. Pourkavoos on March 28, 2013, and May 15, 2013.  Thus, a scar on her wrist could not have been present during any of the office visits with Dr. Pourkavoos;

i)  By mischaracterizing a potentially lethal lesion that could metastasize as a simple "scar," Espinoza led the court to believe that the Plaintiff's integumentary examination for metastases was gratuitous and, therefore, medically unjustified;

j)  Had Espinoza obtained and reviewed the records, and consulted with a physician he would have determined that the integumentary examination of the Sister that occurred in March of 2013 for any other pigmented lesions suspicious of melanoma was standard of care, for patient's safety, and for an absolutely necessary bona fide medical purpose;

k)  Had he obtained and reviewed the medical records he would have determined that the Sister underwent the melanoma examination that is referred to in the warrant in March rather than February of 2013, as Sister stated in her recorded interview;

l)  Rather than asking her if she had "any other medical issues" as averred to by Espinoza in the warrant, the recorded interview reveals that Sister actually stated that the Plaintiff asked her if she had any other "dots" (suspected melanomas) anywhere else to which Ssister answered "Well, I do have this little birth mark on my back and I was wearing like a sweatshirt";

m)  By altering the doctor's inquiry about "dots" anywhere else into "any other medical issues," he created the false illusion that the rest of the integumentary examination, including the skin of the chest area and the skin of the back area, and scanning of the body, as described by the Sister ("scans my body"), was unnecessary, gratuitous and predatory;

n)  Had he obtained and reviewed the medical records he would have determined that the birth mark was actually addressed in a different visit other than March of 2013;

o)   In that it omitted that when Sister was first asked during the interview "so, he didn't touch your breasts?" the Sister answered in the negative;

p)   In that the affidavit omits that through leading questions Espinoza got the Sister to parrot his own statement that the top of her breasts were touched as evidenced by:

> "Q.   So he didn't, he didn't touch your breasts?
> A.   Uh uhn.
> Q.   Just like your --
> A.   Just there and kinda moved it in places like that and like just on it a little bit so like it moved, you know, like just the top.
> Q.   So he did touch the top of your breasts?
> A.   The, the, yeah.  I mean, yeah.
> Q.   Top of the breasts?
> A.   Not the chest right here but like right here a little bit.
> Q.   He touched the top of your breast area --
> A.   Yeah.
> Q.   We could say.
> A.   Yeah, yeah.
> Q.   Okay."

q)   In that the affidavit omitted that the examination of her skin for melanomas was performed quickly: "It just happened just really quick, you know. Looking at my wrist, whatever, then to my back and down my shirt. *So I just didn't think anything of it*";

r)   In that the affidavit omitted that the Sister stated by "opening up the bra on both sides," i.e., by pulling the sports bra up on both sides, the plaintiff was performing a skin examination for a bona fide medical purpose of detecting the existence of life threatening melanomas – "scans my body and than just like opens my bra on both sides to see if like anything is down there but there is nothing";

s)   In that the affidavit phrase, "without saying anything," was inserted by Espinoza arising from his flawed interview of the Sister and his unconstitutional insertion of this phrase into the dialogue of the interview;

t)   Had he obtained and reviewed the medical records he would have learned that the bronchitis visit referred to as the second visit was the same visit where the plaintiff examined the Sister for melanoma and referred her to the University of Connecticut dermatology department and, not two to three months later as averred to by Espinoza;

u) The affidavit omitted that when the Plaintiff was using the stethoscope for
bronchitis he and the Sister were appropriately conversing…("I forget what
we were talking about");

v) In that the affidavit omitted that the Sister reported to Espinoza that "he
wanted to check my breathing…..he wanted me to take off my shirt….I think
it was because he told me to take it off because the sweat shirt was too thick, I
believe";

w) In that the affidavit omitted that during the recorded interview Sister stated to
Espinoza that she was wearing a sports bra and lying on the examining table at
the request of the Plaintiff in order to make the physical examination of the
heart and lung appear aberrant:

> "Q. Okay.  During this exam, Dr. Pourkavoos told me that he needed to
>    listen to my lungs.  …I think you said you were in a sitting position --
> A. Um hm.
> Q. And he was examining --
> A. My back.
> Q. With a stethoscope.
> A. Um hm.
> Q. I was seated, I was seated and used the, I knew I'd have to spell this
>    word.
> DETECTIVE REID:  You could just say scope.
> A. Scope.
> Q. Use the, use the scope do you think?
> A. Uh huh.  Yeah."

x) The affidavit omitted that when the Plaintiff asked her to use the stethoscope
he asked her to "breathe in and out" and Espinoza admitted he was unable to
spell the word, "stethoscope," and, therefore, in the signed statement replaced
it with the word "scope";

y) In that the affidavit omitted that in a medically appropriate *heart* and lung
exam a patient's breast may be exposed as the auscultation with a stethoscope
must be done on the chest and not over the bra of the patient;

z) Had he obtained and reviewed the chart prior to arresting the Plaintiff,  he
would have known that the Plaintiff examined the Sister's heart in addition to
the lung during the bronchitis-related appointment which occurred on March
28, 2013;

aa) Had Espinoza consulted with a doctor he would have learned that it is not
standard of care to examine with a stethoscope the patient's heart over the bra

or other garment;

bb) Had he obtained and reviewed the chart he would have determined that on March 28, 2013, the Sister was complaining of chest tightness, increased pain on inhalation, cough, body aches and a fever of 101.4 F;

cc) In that Espinoza, by writing in the affidavit involving the Sister, "without saying anything" falsely imputed mens rea to the plaintiff whereas the Sister told Espinoza that the Plaintiff "was just listening I guess. So I like normally when someone has the stethoscope on you, you have to be quiet";

dd) In that Espinoza, by inserting into the affidavit that the stethoscope touched the top of the patient's breast, insinuated criminal behavior to the judge reviewing the warrant when, in fact, a standard of care examination with a stethoscope necessitates examination of the heart at different auscultation points including areas along and about the breast;

ee) That the affidavit omitted the fact that the police, by utilizing a leading question, obtained the desired response from the Sister that "and never, no one has ever done that as a Doctor before listening to your lungs and stuff like that…"; and,

ff) That the affidavit unconstitutionally added the statement that "she wanted to assist in the investigation so others are not exposed to this type of treatment" in spite of the fact that the Sister never made such a statement.

75. Despite Espinoza's cursory representation that he had communicated with an investigator from the Department of Public Health, he plainly failed to consult with any physician to opine on whether the alleged examinations were supported by a bona fide medical purpose, or if he did, he failed to provide any information to the Court concerning that element of the crimes charged.

76. In fact, in accordance with an affidavit signed by Stanley Peck in August of 2016, with over two decades experience as DPH's attorney, former Director of Medical Quality Assurance and Chief Legal Officer for the Connecticut Department of Health, a duly qualified physician must be consulted and the subject physician must be given the opportunity to provide

an opinion from an expert in his field regarding whether the standard of care has been violated.

77.     Espinoza's omission of material information from his two sworn affidavits, and not to consult with a medical professional, resulted in warrant affidavits that unconstitutionally averred that the patients underwent unwarranted medical examinations when that is actually and factually contrary to the documented evidence possessed and personally reviewed by Espinoza.

78.     The repeated omission of the patient's own interview statements indicating that any alleged examination was, in fact, responsive to the patient's complaints, presentation, and medical history, was indisputably material.

79.     Upon the issuance of the January 21, 2014, arrest warrants, a number of local news organizations reported on the arrest of Dr. Pourkavoos.  At the same time, insurance providers began contacting patients of Dr. Pourkavoos and advising that Dr. Pourkavoos had sexually assaulted patients and that the patients had to find another physician.

80.     Press outlets also published the contents of the initial warrant affidavits on their websites, making the details of the allegations contained in them available to the public.

81.     This publicity kicked off a lead to several other false accusations that fueled Espinoza's witch-hunt and even served as an advertising platform for a personal injury lawyer looking to capitalize on this event. Some patients were seeking financial gain, some were vindictive for reasons utterly unrelated to the manner of their physical examination; few were clearly influenced by television news and second-guessed their innocuous past office visits.

82.     At least one widely broadcast report even contained a televised interview with a Connecticut personal injury attorney who had delivered himself to the doctor's office to be interviewed on camera the very day that the doctor was first arrested.

83.     Billed as an attorney who "specializes in this kind of case," he opined in the TV interview he sought that "a lot of them [doctors] do that, it's unfortunate that they do that, but they're in a position where, uh, where the women look up to them and, uh, they're in a position to do that."

84.     Forty-eight (48) hours after that report aired, a then-current patient of Dr. Pourkavoos' (who was at that time concurrently suing a grocery store and a gas station for money damages), contacted that lawyer who had appeared on television, who immediately filed a civil suit seeking more than One Million Five Hundred Thousand ($1,500,000.00) Dollars in damages from Dr. Pourkavoos even before a complaint was made to the police.  In that complaint, this litigious patient alleged she had been subjected to inappropriate examinations and incorporated as an allegation of her own complaint for money damages the allegation that Dr. Pourkavoos had committed multiple acts of "sexual predation," based directly on the warrants wrongfully obtained by Detective Espinoza and his own statements.

85.     It was not until after hiring a lawyer and suing for over One Million Five Hundred Thousand ($1,500,000.00) Dollars damages, and being prepared by the lawyer, that this patient finally contacted police.

86.     After this, the lawyer posted a bulletin on his website announcing the suit and advertising his services.

87.     With this widespread publicity of the allegations in the initial warrant affidavit, as mentioned above, several additional patients – from among his over six thousand (6,000) patients – contacted police with concerns regarding their past examinations.

88.     At the same time, based upon information and belief, Espinoza withheld

exculpatory information of the other patients who reported that the allegations were not at all consistent with their experiences with Dr. Pourkavoos.

89.     Like the patients identified in the initial warrant, the additional complaining patients principally complained that they felt "uncomfortable" during these medical exams of intimate body parts, and only later agreed to sign written statements prepared, not by the patients, but by Espinoza himself, that included his own fabricated allegations of "fondling" and similar mischaracterizations of conduct never mentioned by the patients in the course of their recorded interviews.

90.     Not only was each and every one of the subsequent warrant affidavits necessarily the product of the improperly issued initial arrest warrants, but Espinoza's allegations in all of the subsequent warrant affidavits similarly misrepresented and omitted material information concerning the office visits and the treatments.

91.     As a result of Espinoza's actions, the medical career of the Plaintiff which spanned over a time frame of twenty five (25) years was destroyed.  His relationship with medical colleagues was fractured, he suffered agonizing shame with his family and in the community, his patient base dissipated, and he was viciously vilified in the news and on television. Practically everything that he had built up in the course of many years of diligent medical practice was taken from him.

92.     These warrants will be subject to a separate lawsuit against the Defendants.

## COUNT I – FOURTH AMENDMENT AS TO ALL DEFENDANTS

1.     Plaintiff incorporates by reference the allegations set forth in paragraphs 14

through 92, as if fully set forth herein.

93.     Under the Fourth Amendment, as applied to the Defendants by the Fourteenth Amendment to the United States Constitution under 42 U.S.C. §1983, the Plaintiff, Dr. Pourkavoos, has right to be free from unreasonable force, detention and/or prosecution without probable cause.

94.     Dr. Pourkavoos was arrested without probable cause as a result of the actions of the Defendants who created and presented a false affidavit to the Superior Court in order to have an arrest warrant issued for Dr. Pourkavoos.

95.     The arrest of Dr. Pourkavoos was without probable cause because the evidence in the possession of Espinoza showed that the allegations in the affidavit used to secure arrest warrants were either blatantly false or misleading at best.

96.     As a result of the Defendants' actions, Dr. Pourkavoos was falsely arrested and handcuffed and imprisoned at the Avon Police Department on or about January 22, 2014, and June 4, 2014.

97.     The Defendants violated Plaintiff's Fourth Amendment rights in one or more of the following ways:

      a.  In that Espinoza conspired, confederated, and contributed to Dr. Pourkavoos' arrest by mischaracterizing the statements made by complaining patients during their interviews in his warrant affidavit;

      b.  In that Espinoza failed to properly evaluate the evidence that they had obtained;

      c.  In that Espinoza failed to present the true and relevant facts to the judge who issued the arrest warrant;

      d.  In that Espinoza failed to recognize, with respect to the initial arrest warrant, that the available evidence could not establish probable cause for the crimes

charged;

e.  In that Espinoza failed to include evidence in the initial arrest warrant that not only was the principal complainant a documented drug user, convicted of forgery (a crime of deception), who left rambling and incoherent voice messages for the investigating officer during the course of the investigation that prompted Espinoza's own suspicion of her drug use, but also her documented medical history and the contemporaneous records of her visits to Dr. Pourkavoos' office established that she was not truthful in her interview with police;

f.  In that Espinoza failed to disclose his doubts about the criminality of much of the conduct being reported to him, noting, for example, that "a lot of, a lot of what people are telling us doesn't necessarily fall into a, a criminal category that we can arrest him for…";

g.  In that Espinoza failed to consult with any medical professional to evaluate the witnesses' medical history or the clinical context of these allegations – knowing that he lacked any professional medical training;

h.  In that Espinoza consciously disregarded and failed to disclose the voluminous information supporting the existence of a bona fide medical purpose for every alleged examination;

i.  In that Espinoza failed to include in his affidavit the substantial contemporaneous documentary evidence that he sought, possessed, and reviewed that established directly that all the conduct he alleged was criminal was undertaken for the patients' own safety and for a bona fide medical purpose;

j.  In that Espinoza failed to disclose to the court the doctor's unblemished record of treating thousands of patients, based upon the affiant's medically uninformed interaction with uninformed patients with patent criminal and mental health credibility issues, notwithstanding that the medical records establish that Dr. Pourkavoos was using his own significant education, training and experience to help keep these same patients safe;

k.  In that Espinoza failed to perform a reasonable inquiry before the affiant swore that probable cause existed to believe that Dr. Pourkavoos had committed sexual assault;

l.  In that Espinoza failed to disclose material information supporting the existence of a bona fide medical purpose for each and every alleged examination;

m.  In that the Defendants initiated or procured the institution of criminal proceedings against the Plaintiff;

n.  In that the Defendants acted without probable cause;

o.  In that the Defendants acted with malice for a purpose of other than bringing an offender to justice;

p.  In that the Defendants failed to properly evaluate the evidence that they had obtained;

q.  In that the Defendants failed to present the true and relevant facts to the judge who issued the arrest warrant;

r.  In that the Defendants failed to recognize, with respect to the initial arrest warrant, that the available evidence could not establish probable cause for the crimes charged;

s.  In that Espinoza failed to disclose his doubts about the criminality of much of the conduct being reported to him, noting, for example, that "a lot of, a lot of what people are telling us doesn't necessarily fall into a, a criminal category that we can arrest him for…."

t.  In that Espinoza consciously disregarded and failed to disclose the voluminous information supporting the existence of a bona fide medical purpose for every alleged examination.

98.  As a direct and proximate result of the actions of the Defendants, Dr. Pourkavoos was falsely arrested and suffered pain and suffering, lost wages and earnings, mental anguish, humiliation, irreparable injury to professional reputation and other lawful damages, then and continuing into the future.

99.  As a direct and proximate result of the actions of the Defendants, Dr. Pourkavoos' medical practice, consisting of thousands of patients and a handful of employees, was completely destroyed.

100.  The Defendants' conduct alleged above was outrageous and shocking to the

conscious, in violation of Plaintiff's right to be protected from unreasonable searches and seizures without probable cause as guaranteed by the Fourth Amendment of the United States Constitution.

## COUNT II –NEGLIGENCE AS TO ALL DEFENDANTS

1.      Plaintiff incorporates by reference the allegations set forth in paragraphs 14 through 92, as if fully set forth herein.

93.     At all relevant times, Espinoza was under the control and direction of the Police Department of the Town of Avon and its Chief of Police, the Defendant Rinaldo.

94.     The Defendant Rinaldo was negligent in that he failed to properly supervise Espinoza.

95.     The Defendant Rinaldo and the Town of Avon are legally liable for the negligence of Espinoza and are negligent in one or more of the following ways in that their employees, agents, and/or representatives:

   a.   Conspired, confederated, and contributed to Dr. Pourkavoos ' arrest by mischaracterizing the statements made by complaining patients during their interviews in his warrant affidavit;

   b.   Failed to properly evaluate the evidence that they had obtained;

   c.   Failed to present the true and relevant facts to the judge who issued the arrest warrant;

   d.   Failed to recognize, with respect to the initial arrest warrant, that the available evidence could not establish probable cause for the crimes charged;

   e.   Failed to include evidence in the initial arrest warrant that not only was the principal complainant a documented drug user, convicted of forgery, who left rambling and incoherent voice messages for the investigating officer during the course of the investigation that prompted Espinoza's own suspicion of her drug use, but also her documented medical history and the contemporaneous records of

her visits to Dr. Pourkavoos' office established that she was not truthful in her interview with police;

f.  Failed to disclose doubts about the criminality of much of the conduct being reported to Espinoza, noting, for example, that "a lot of, a lot of what people are telling us doesn't necessarily fall into a, a criminal category that we can arrest him for…";

g.  Failed to consult with any medical professional to evaluate the witnesses' medical history or the clinical context of these allegations knowing that Espinoza was unqualified to make any medical assessments about the care and treatment provided by the Plaintiff;

h.  Consciously disregarded and failed to disclose the voluminous information supporting the existence of a bona fide medical purpose for every alleged examination;

i.  Failed to ensure that Espinoza's affidavits included the substantial contemporaneous documentary evidence that established directly that all the conduct alleged as criminal was undertaken for the patients' own safety and for a bona fide medical purpose;

j.  Failed to disclose to the court the doctor's unblemished record of treating thousands of patients, based upon the affiant's medically uninformed interaction with uninformed patients with patent criminal and mental health credibility issues, notwithstanding that the medical records establish that Dr. Pourkavoos was using his own significant education, training and experience to help keep these same patients safe;

k.  Failed to ensure a reasonable inquiry was performed before the affiant swore that probable cause existed to believe that Dr. Pourkavoos had committed sexual assault;

l.  Failed to disclose material information supporting the existence of a bona fide medical purpose for each and every alleged examination;

m.  In his warrant application, Espinoza represented that he "received training in the investigation of criminal and other matters," however, upon information and belief, Espinoza has never received adequate and/or any training in matters concerning the arrest of a treating physician for the sexual assault of his or her patients;

n.  Upon information and belief, this incident involving the investigation and subsequent false arrest of Dr. Pourkavoos was the first criminal prosecution of a

treating physician for sexual assault that Espinoza had ever investigated.  Rather, Espinoza had no experience investigating and prosecuting cases of sexual assault against treating physicians;

o.  Further, based on information and belief, this was the first time the Defendant Avon Police Department, as an organization, had investigated and prosecuted a treating physician for sexual assault;

p.  Acting under color of the authority of law and pursuant to the official policies, practice and customs, Defendant Avon Police Department, knowingly or recklessly failed to instruct, supervise, train, control and/or discipline, on a continuing basis, Espinoza in his duty to refrain from arresting persons without probable cause and documenting true and accurate facts in affidavits used to secure arrest warrants. These failures of Avon Police Department caused or substantially contributed to the damages of the Plaintiff;

q.  The Defendant Avon Police Department, directly or indirectly, under the color of law, approved or ratified the unlawful, deliberate, malicious and/or reckless and wanton conduct of Espinoza  by failing to conduct any competent investigation, take any corrective action, provide any reprimands or in any way provide subsequent supervision and remedial measures regarding Dr. Pourkavoos' arrest such that the only conclusion that can be drawn from these facts is that the Avon Police Department condoned Espinoza's actions;

r.  As a direct and proximate result of the unlawful and malicious actions of the defendant Avon Police Department, Dr. Pourkavoos suffered injury, was deprived of his right to be secure in his person and property against unreasonable seizures of his person and property in violation of the Fourth Amendment of the United States Constitution;

s.  As a direct and proximate result of the actions of the Defendant Avon Police Department, Dr. Pourkavoos was falsely arrested and suffered pain and suffering, lost wages and earnings, mental anguish, humiliation, loss of professional reputation and other lawful damages, then and continuing into the future; and

t.  As a direct and proximate result of the actions of the Defendant Avon Police Department, Dr. Pourkavoos suffered lost income, revenues, patients, and injury to its professional reputation and other lawful damages then and continuing into the future.

96.  As result of the Defendant's negligence, the Plaintiff suffered the loss of his

medical practice, revocation of his medical license, pain and suffering and a shock to his nervous

system.

97.     Pourkavoos was part of a narrowly defined class of foreseeable victims subject to imminent harm.

98.     The Defendants were public officials to whom it was apparent that their conduct was likely to subject Pourkavoos to harm.

## COUNT III – TOWN OF AVON - INDEMNIFICATION PURSUANT TO §7-465

1.     Plaintiff incorporates by reference the allegations set forth in paragraphs 14 through 92, as if fully set forth herein.

93.     Pursuant to C.G.S. §7-465, the Town of Avon is responsible for the actions of the Defendants which occurred during the scope of their employment.

94.     As a result of the actions of the Defendants, the Plaintiff has suffered economic and non economic damages.

## COUNT IV (MUNICIPAL LIABILITY UNDER §52-557n)

1.     The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 14 through 92.

93.     Pursuant to § 52-557n(a)(1)(A) of the Connecticut General Statutes, the Defendant Town of Avon is liable for the damages suffered by Dr. Pourkavoos due to the acts of its employees, officers, and/or agents as set forth herein.

## COUNT V –LOSS OF CONSORTIUM AS TO ALL DEFENDANTS

1.     Plaintiff incorporates by reference the allegations set forth in paragraphs 14

through 92 as if more fully set forth herein.

      93.     At all times relevant, Dr. Pourkavoos was and is currently the spouse of Dr. Mariam Hakim-Zargar.

      94.     As a result of the negligence and carelessness of the Defendants through their agents, servants, or employees, the Plaintiff, Dr. Mariam Hakim-Zargar, was deprived of the services, care, society, solace, affection, companionship, and consortium of the Plaintiff,  Dr. Pourkavoos, all to her loss and detriment.

## **RELIEF REQUESTED**

WHEREFORE, the Plaintiffs respectfully request the following relief:

      A.     A declaratory judgment that the Defendants' acts, policies, and practices herein described have violated Plaintiffs' rights under the Fourth and Fourteenth Amendment to the United States Constitution as guaranteed pursuant to 42 U.S.C. §1983.

      B.     Just, reasonable and fair compensatory monetary damages from each Defendant.

      C.     Just, reasonable and fair actual and punitive monetary damages from each Defendant.

      D.     Any and all nominal damages from each Defendant.

      E.     Attorney's fees pursuant to Title 42 U.S.C. §1988.

      F.     All costs associated with bringing this lawsuit.

      G.     Such legal and equitable relief as the Court deems appropriate.

## CLAIM FOR JURY TRIAL

The Plaintiffs claim trial by jury for all issues in this case.

THE PLAINTIFFS,

BY _____

Patrick Tomasiewicz (ct01320)
Fazzano & Tomasiewicz, LLC
96 Oak Street
Hartford, CT 06106
Tel: 860-231-7766
Fax: 860-560-7359
pt@ftlawct.com