**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| KHOSRO POURKAVOOS, MD and | ) | 3:17-CV-00073 (SVN) |
| MARIAM HAKIM-ZARGAR, MD, | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOWN OF AVON and DETECTIVE | ) | March 10, 2023 |
| EDWARD ESPINOZA, | ) | |
| *Defendants*. | ) | |

<u>**RULING AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

Sarala V. Nagala, United States District Judge.

In this civil rights action, the lead Plaintiff, Dr. Khosro Pourkavoos, alleges primarily that Detective Edward Espinoza of the Avon Police Department and the Town of Avon, Connecticut ("Defendants") violated his constitutional rights by arresting him on sexual assault charges that were ultimately dropped by the State. Co-Plaintiff Dr. Mariam Hakim-Zargar, Dr. Pourkavoos' wife, alleges an associated claim for loss of consortium.

Presently before the Court is Defendants' motion for summary judgment, arguing that Espinoza's actions were supported by probable cause, or at least by arguable probable cause, such that Espinoza is entitled to qualified immunity. Defendants further argue for dismissal of Dr. Pourkavoos' state law claims and Plaintiff Dr. Hakim-Zargar's derivative claim for loss of consortium. For the reasons set forth below, the Court DENIES Defendants' motion for summary judgment as to Dr. Pourkavoos' federal claim brought under 42 U.S.C. § 1983 and Dr. Hakim-Zargar's associated loss of consortium claim, and GRANTS Defendants' motion as to Dr. Pourkavoos' state law negligence and indemnification claims and the loss of consortium claim derived from these state law claims.

## I.      FACTUAL BACKGROUND

Dr. Pourkavoos had been a practicing family physician since 1993.  Pourkavoos Dep. Tr., ECF No. 129-27 at 4:23–25.  Until the events underlying this suit, he was licensed by the State of Connecticut to practice medicine and was in good standing.  *Id.* at 13:22–25.  During the relevant time period, Dr. Pourkavoos had an office in Avon, Connecticut, where he saw patients and practiced general family medicine.  Pls.' Local Rule ("L. R.") 56(a)2 Statement ("St."), ECF No. 129, ¶ 4.

### A.   Patient 1[1]

On June 27, 2013, a female individual ("Patient 1") appeared at the Avon Police Department ("APD") with a victim's advocate and reported that Dr. Pourkavoos had sexually assaulted her during a recent medical appointment.  *Id.* ¶ 6.  Officer Eric Lundell was dispatched to speak to Patient 1.  APD Incident Report, ECF No. 117-17 at 1.  Officer Lundell took a report that contained "minimal facts," with the belief that this report would be forwarded to an assigned detective or other investigator for further development.  Lundell Dep. Tr., ECF No. 117-19, at 19:21–25.  In this report, Officer Lundell noted that Patient 1 stated Dr. Pourkavoos "fondled her buttock and breasts" during the examination.  ECF No. 117-17 at 3.  At his deposition, Officer Lundell could not recall if Patient 1 specifically used the word "fondled," Lundell Dep. Tr. at 27:13, but he stated that he has no reason to believe that he did not accurately convey Patient 1's words, *id.* at 30:7–16.  Upon receiving this report, the APD assigned Detective Espinoza to investigate.  Pls.' L. R. 56(a)2 St. ¶ 7.

---

[1] The Court has granted the parties' motions to seal various filings in this case, in order to protect the privacy of medical information and of information protected from disclosure by Connecticut General Statutes §§ 54-142a and 54-86e.  ECF Nos. 121, 133, 139, and 143.  Nonetheless, the Court believes it is necessary to set forth the facts expressed in the interviews, written statements, and warrant applications in relatively robust detail in order to fully explain its ruling.  Because the Court's recitation of the facts does not disclose any identifying information for the Patients, no portion of this ruling requires redaction or sealing.

1.  *The Interview*

On July 8, 2013, Espinoza interviewed Patient 1 at the APD.[2]  *Id.*  During this interview, which was contemporaneously audiotaped and later transcribed, Patient 1 relayed the following information.  She stated that in May of 2013, she walked into Dr. Pourkavoos' office hoping to be seen about a rash that had appeared throughout her arms and legs.  Patient 1 Interview Tr., ECF No. 117-13, at 3:18–23.  Patient 1 also stated that she brought family members with her to at least three prior appointments with Dr. Pourkavoos, *id.* at 6:26–7:16, because her memory sometimes gets "overwhelmed" at medical appointments, and she wanted to make sure she has someone else that knows "what was said." *Id.* at 6:9–22.  At the particular appointment in May of 2013 that she was discussing, however, she went to Dr. Pourkavoos' office alone.  *Id.* at 6:26–7:16.

After arriving at the office, Patient 1 was seen by Dr. Pourkavoos, who instructed her to take off all her clothes and then began to examine her.  *Id.* at 4:1–5.  At this point, Dr. Pourkavoos looked at both her arms and legs, as well as "push[ed] around" other areas of her body while asking if she had any pain.  *Id.* at 4: 15–19.  Dr. Pourkavoos then spread her legs and looked at her vagina, and then did the same thing with her buttocks, despite Patient 1 informing Dr. Pourkavoos that her husband already "checked there."  *Id.* at 4:21–24.[3]  Patient 1 continued that Dr. Pourkavoos then began squeezing her breasts, but also noted that she informed him of a lump in one of her breasts, which Dr. Pourkavoos confirmed that he felt.  *Id.* at 4:24–29.  After this, Dr. Pourkavoos instructed Patient 1 to get dressed and ordered some lab work to be done.  *Id.* at 4:30.  Dr. Pourkavoos

---

[2] The parties generally agree that Patient 1 made each of the statements discussed in this section during her interview on July 8, 2013.  Dr. Pourkavoos contends that the techniques used by Detective Espinoza to elicit these statements, as well as Detective Espinoza's allowing Patient 1 to sign a written sworn statement after she expressed confusion about signing such a statement, were improper.  He also argues that the written statement omitted and mischaracterized Patient 1's interview statements.  The Court will examine these contentions, and the factual support for them, during its examination of the merits of Defendants' motion.

[3] During her interview, Patient 1 did initially report that Dr. Pourkavoos examined her vagina.  As discussed below, however, it appears that she attempted to correct this statement later in the interview to indicate that Dr. Pourkavoos did not in fact examine her vagina.

informed her that he would need to follow up with her when he received the results of the lab work. *Id.* at 5:5–6.

This follow-up appointment took place in June of 2013. *Id.* at 9:21–23. While this appointment was originally scheduled for the purpose of reviewing Patient 1's prior blood test results, Patient 1 informed Detective Espinoza that, once at Dr. Pourkavoos' office, she told Dr. Pourkavoos that she had been feeling very weak, sleeping an excessive amount, and having issues with paralysis in her legs. *Id.* Patient 1 further informed Detective Espinoza that, in the past, Dr. Pourkavoos had written her a prescription for medication to aid her with constipation; Patient 1 stated, however, that she was not actively complaining of constipation at her appointment on June 26. *Id.* at 11:1–26; Pl.'s L. R. 56(a)2 St. ¶ 11. Despite that she had not complained of constipation at this particular appointment, Patient 1 told Detective Espinoza that, during the appointment, Dr. Pourkavoos said "I'm gonna check for constipation" and then simultaneously digitally penetrated her vagina and rectum, without warning or asking for permission. Patient 1 Interview Tr., ECF No. 117-13 at 14:3–15; Pl.'s L. R. 56(a)2 St. ¶ 9.

At the conclusion of this interview, Patient 1 signed a sworn statement regarding her complaint. Pl.'s L. R. 56(a)2 St. ¶ 12.

### 2. *The Written Statement*

The written statement signed by Patient 1 is far shorter than the interview she gave Detective Espinoza. The Court reproduces the statement in its entirety below:

> I give this statement to Det. Espinoza and Det. Reid of the Avon Police Dept. of my own free will and without any threats or promises made to me.
> For approximately the last 2 years I have been seeing Dr. Khosro Pourkavoos located in Avon Ct. I have seen Dr. Pourkavoos for several appointments. During these appointments I was usually accompanied by friends and family. This past May 2013 I was suffering from a rash that had spread to my forearms and legs. I tried calling Dr. Pourkavoos' office but did not hear back and decided to "walk into" the office. During Dr. Pourkavoos [*sic*] examination of this

rash I was told to take off all of my clothing. Dr. Pourkavoos remained in the office while I undressed. Dr. Pourkavoos proceeded to examine me by touching and fondling my buttock and breasts. Dr. Pourkavoos was not wearing any gloves during this examination. No other medical staff was present during this examination. I felt uncomfortable during this examination.

Dr. Pourkavoos ordered a blood test during this exam and told me to come back for another appointment to go over the results and to recheck the rash. My next appointment with Dr. Pourkavoos was on 6/26/13. I told the nurses and Dr. Pourkavoos that I was there to go over my blood test and that I was tired due to anemia; and that I was feeling some paralysis in my leg. I was not acompanied [sic] by anyone during this appointment. During this appointment Dr. Pourkavoos asked me to undress. I kept my bra and underwear on. Dr. Pourkavoos had me sit and he examined my spine with his hands while sitting Dr. Pourkavoos unhooked my bra and made a comment about scholiosis [sic]. Dr. Pourkavoos asked me to lie down on my front. Dr. Pourkavoos continued to examine my spine. Dr. Pourkavoos worked his way towards my lower back. Dr. Pourkavoos then said I am going to check you for constipation and then immediately pulled down my underwear and inserted one finger into my anus and one finger into my vagina. I have had exams for constipation in the past by emergency room doctors and Dr. Pourkavoos [sic] exam felt different. Dr. Pourkavoos [sic] exam lasted longer and I could feel him move his fingers around in a strange way. I felt that I had been sexually violated by Dr. Pourkavoos [sic] exam. I was upset and tried calling my husband but he was not answering. I called and talked to my mother, [redacted], and my psychiatrist [redacted] about this incident on 6/26/13. I talked with my husband about this incident during the evening of 6/26/13. I called the crisis center on 6/27/13 to report this incident. I want to add that during my May exam with Dr. Pourkavoos I recall that he tried to move my thighs apart and said 'I have to check.' I told him that my husband had already checked there as I held my thighs together. Dr. Pourkavoos said 'I have to check anyway.' Dr. Pourkavoos then moved my thighs apart and examined my vagina by spreading my vagina open.

I want to pursue criminal charges against Dr. Pourkavoos for these incidents because I do not want this to happen to anyone else.

I swear this statement is true to the best of my knowledge.

Patient 1 Written St., ECF No. 117-4. While Detective Espinosa was reading the written statement he had prepared back to Patient 1, she expressed confusion at least twice, saying first that she was "like really confused" about what Detective Espinoza had written concerning to whom she had initially reported the incidents. ECF No. 117-13 at 50:15. Later, when Detective Espinoza read the portion of the written statement about Dr. Pourkavoos examining Patient 1's vagina by spreading it open, Patient 1 clarified that it was "not my vagina, I don't know." *Id.* at 63:9. She went on to ask if the "tape recorder" was involved, and explained that she gets "really like confused

when, when, when things are, written and then, and then kept changing and then, and then read to me, and then it like puts another story in, you know, when I have to like correct," *id.* at 63:13-20.

## B.   Execution of Search Warrant and Interview of Dr. Pourkavoos

Following this interview, Detective Espinoza, along with another APD Detective, Detective Reid, applied for and obtained a warrant to seize "all medical records" for Patient 1 "compiled by the office of Dr. Pourkavoos," which they executed on August 9, 2013.  Pls.' L. R. 56(a)2 St. ¶ 15.  After execution of the search warrant, Dr. Pourkavoos went to the APD for a voluntary interview with Detectives Reid and Espinoza.  *Id.* ¶ 16.  During this interview, Dr. Pourkavoos was asked about the treatment he provided Patient 1 and was allowed to review the records from two separate appointments he had with her.  *Id.* ¶ 18.  Detectives Reid and Espinoza then proceeded to interview Dr. Pourkavoos regarding his treatment of Patient 1 for a little more than ninety minutes.  Dr. Pourkavoos Interview Tr., ECF No. 117-14, at 1.  Throughout this interview, which was contemporaneously audiotaped and later transcribed, Dr. Pourkavoos repeatedly stated that while he had seen Patient 1 several times, he did not have any specific recollection of the June 26 visit.  *See, e.g.*, *id.* at 5:7–16.  He acknowledged that, while he may have conducted a rectal exam due to Patient 1's history of issues with constipation, *id.* at 35:3–9, he did nothing inappropriate during these visits, and that he had never done anything inappropriate to a patient of his, *see, e.g.*, *id.* at 23:8–17.  He further offered to provide a sworn statement that he "never touched her vagina and [he] never inserted any fingers inside of her vaginal area."  *See, e.g.*, *id.* at 31:23–25.

## C.   Patients 2 and 3

After interviewing Dr. Pourkavoos, Detective Espinoza continued his investigation.  As his arrest warrant application details, he contacted the Connecticut Department of Health and inquired

into Dr. Pourkavoos.  ECF No. 131-10 at 8.  He was informed the Department of Health had also

opened an investigation into the incident reported by Patient 1.  *Id.*  The Department of Health also

advised Detective Espinoza that there were complaints pertaining to similar conduct by Dr.

Pourkavoos posted on two separate websites.  *Id.*  These websites are "medical search engines"

where patients are able to submit reviews of doctors they have visited.  *Id.*  The postings on the

websites were made anonymously, but Detective Espinoza was able to contact the websites and

obtain an Internet Protocol ("IP") address for the poster of a particular comment dated May 31,

2013.  The comment stated that Dr. Pourkavoos had "molested" both of the poster's daughters and

would "take it upon himself to pull down your pants or lift up your bra."  *Id.* at 8–9.  This IP

address was then used to identify the account holder who had posted the comment.  *Id.* at 9.  The

account holder informed Detective Espinoza that she had intended to file an official complaint but

had not yet done so.  *Id.*  The account holder provided Detective Espinoza with the contact

information of her two adult daughters, whose experiences with Dr. Pourkavoos had led to her

writing the negative reviews.  *Id.*  On October 4, 2013, Detective Espinoza interviewed each

daughter separately ("Patient 2" and "Patient 3").  Pls.' L. R. 56(a)2 St ¶ 29.  At the conclusion of

their interviews, which were contemporaneously audiotaped and later transcribed, Patients 2 and

3 both submitted sworn written statements attesting to what happened during their appointments

with Dr. Pourkavoos.[4]

1.  *Patient 3*

a.  The Interview

Detective Espinoza first interviewed and received a sworn written statement from Patient

3.  Patient 3 Interview Tr., ECF No. 117-15.  During her interview, Patient 3 stated that she began

---

[4] As with Patient 1's written statement, Plaintiffs do not dispute the authenticity of these statements, but protest the
way in which they were obtained.  The Court will address these concerns below as necessary.

seeing Dr. Pourkavoos after her mother recommended him.  *Id.* at 4:5–10.  Patient 3 had several appointments with Dr. Pourkavoos spanning approximately a year and a half, where nothing out of the ordinary occurred.  *Id.* at 4:20–25.  In February of 2013, however, Patient 3 went to Dr. Pourkavoos complaining of a blue dot on her wrist that she got when she stabbed herself with a pen as a child.  *Id.* at 5:6–7.  After telling her that she should get the blue dot removed, Dr. Pourkavoos asked if Patient 3 had any other concerns, and she informed him that she had a birthmark on her back.  *Id.* at 5:12–13.  Dr. Pourkavoos asked her to remove her sweatshirt so he could take a look.  *Id.* at 5:14.  Patient 3 removed her sweatshirt; she was wearing only a bra underneath.  *Id.*  She stated that, after Dr. Pourkavoos examined the birthmark on her back, he "peeked down her bra."  *Id.* at 5:18.  Patient 3 reported that, at this point, Dr. Pourkavoos began looking around for additional problems despite Patient 3 informing him there were no additional points of concern.  *Id.* at 6:3–5.  Dr. Pourkavoos then pulled on her bra so that her nipples were exposed and looked at both breasts.  *Id.* at 6:5–21.  Despite that Dr. Pourkavoos' actions at this appointment made her uncomfortable, Patient 3 did not tell anyone about what had happened at the time.  *Id.* at 7:1–2.

Patient 3 also told Detective Espinoza that she had another appointment with Dr. Pourkavoos approximately two or three months later.  *Id.* at 7:25–26.  Patient 3 scheduled this appointment because she believed she had bronchitis and wanted to be examined.  *Id.* at 8:2–3. When Dr. Pourkavoos examined her, he once again told her to remove her sweatshirt, because it was too thick for him to examine her through.  *Id.* at 8:15–16.  Patient 3 removed the sweatshirt, exposing the sports bra she had underneath.  *Id.* at 8:9.  Dr. Pourkavoos then told her to lie down on the examination table and lifted up her sports bra "so [she] was out in the open."  *Id.* at 8:8–11.

When asked by Detective Espinoza if Dr. Pourkavoos "fondled" her during the examination, Patient 3 expressly denied that he fondled or touched her breasts. *Id.* at 10:26–11:5.

### b.  The Written Statement

Patient 3 also gave a sworn written statement after her interview.  Below is the statement reproduced in its entirety.

> I give this statement to Det. Espinoza and Det. Reid of the Avon Police Dept. of my own free will without any threats or promises made to me.
>
> I have been seeing Dr. Khosro Pourkavoos who's [*sic*] practice is located at 35 Nod Rd. Avon for approximately the past year and a half.  I have had several visits with Dr. Pourkavoos without any incidents.  My past (2) visits with Dr. Pourkavoos, however, made me feel uncomfortable.
>
> The first incident occurred in approximately February of 2013.  I made the appointment with Dr. Pourkavoos for a blue dot/scar on my wrist.  There were no other persons in the room during this examination.  During the exam Dr. Pourkavoos asked if I had any other medical issues.  I told Dr. Pourkavoos that I had a birth mark on my back.  Dr. Pourkavoos asked me to remove my sweat shirt.  I was know [*sic*] only wearing my bra above my waist.  Dr. Pourkavoos asked again if I had any other issues while he was examining my back.  I said 'no.'  Dr. Pourkavoos continued to look and touch my upper chest area.  Dr. Pourkavoos, without saying anything proceeded to lift up each side of my bra, exposing my nipples.
>
> The second incident occurred approximately 2 to 3 months later on my very next visit with Dr. Pourkavoos.  I made the appointment because I was sick with I believe bronchitis.  During this exam no one else was in the examination room.  During this exam Dr. Pourkavoos told me that he needed to listen to my lungs.  He told me that I needed to remove my sweatshirt.  I was now only wearing a sports bra above my waist.  I was seated and Dr. Pourkavoos used the scope on my back.  Dr. Pourkavoos then told me to lie down on my back.  He began to examine my upper chest with the scope.  He moved the scope lower towards my breasts.  He then, with one finger lifted the bra up fully exposing my breasts.  He then continued to examine with the scope, touching the top areas of my breasts.  Dr. Pourkavoos did not say anything during this part of the exam.  I felt very uncomfortable in the way that Dr. Pourkavoos performed this examination since I had not been examined in this way during any previous doctor examination.  I swear this statement is the truth to the best of my knowledge.

Patient 3 Written St., ECF No. 117-9.  Despite giving this interview and written statement to Detective Espinoza, Patient 3 opted not to press charges against Dr. Pourkavoos. *Id.* at 4.

2. *Patient 2*

a. <u>The Interview</u>

Finally, Detective Espinoza interviewed Patient 2.  Patient 2 informed Detective Espinoza that she had begun seeing Dr. Pourkavoos because she was seeking a back specialist that accepted state insurance.[5]  Patient 2 Interview Tr., ECF No. 117-16, at 2:21–25.  She then had a few appointments with Dr. Pourkavoos that she considered "fine."  *Id.* at 3:5.  The first time she experienced a problem with Dr. Pourkavoos was approximately eight months before she spoke to Detective Espinoza.  *Id.* at 3:21.  At that appointment, she reported to Dr. Pourkavoos that her back pain was acting up and that she was having shooting pains down her butt and into her leg.  *Id.* at 4:8–9.  This was the same pain she had reported to Dr. Pourkavoos at an appointment approximately three months prior.  *Id.* at 4:4–5.  Dr. Pourkavoos then had Patient 2 lie down on the table and began "pushing" on her butt.  *Id.* at 4:14.  He asked if the pain shot down Patient 2's leg, and when she responded that it did he pulled down her pants to her "butt crack."  *Id.* at 14–17. Patient 2 then informed Dr. Pourkavoos that she was not wearing any underwear that day, and while Dr. Pourkavoos responded that that was okay, Patient 2 pulled her pants back up and informed him that the pain was above the pant line.  *Id.* at 4:17–20.  Dr. Pourkavoos then started pushing on both sides of Patient 2's buttocks, which Patient 2 reported made her uncomfortable because the pain was only on one side and she did not believe he needed to be pushing both sides. *Id.* at 4:21–23.  Detective Espinoza asked if Patient 2 would characterize Dr. Pourkavoos' actions as "fondling" her, and, after debating the use of this language, she responded that it was "[t]ouching my butt really.  I mean it was like pushing on my butt cheeks almost like he was fondling my butt cheeks."  *Id.* at 4:24–26.

---

[5] Despite that Patient 2 was seeking a back specialist, there is no indication in the record that Dr. Pourkavoos is such a specialist; rather, the record reflects that he accepted Patient 2's insurance so she decided to begin seeing him.

At this point, Patient 2 stated that, without warning, Dr. Pourkavoos pulled her pants down all the way below her butt cheeks. *Id.* at 4:28–30. Dr. Pourkavoos then once again began touching both sides of her buttocks and pushing down with his thumbs, "kinda like spreading my butt cheeks apart." *Id.* at 5:4–7. Patient 2 then told Dr. Pourkavoos that the pain was not in that area and tried to pull her pants up again, but Dr. Pourkavoos told her to "hold on," and started pushing more towards her leg. *Id.* at 5:7–9. Patient 2 repeatedly told him where it hurt, but said Dr. Pourkavoos ignored her and continued to push on and spread her butt cheeks apart. *Id.* at 5:10–12. Patient 2 stated this was "horribly uncomfortable" and that she "didn't really know what to do." *Id.* at 5:12. As soon as Patient 2 felt Dr. Pourkavoos remove his hands after "basically massaging [her] butt," she quickly pulled up her pants and got off the table. *Id.* at 5:14–16. Dr. Pourkavoos then had her sit back down and wrote prescriptions for some medication. *Id.* at 5:17–18.

Patient 2 felt this examination was odd because she had never had a doctor ask her to remove clothing for a back examination before. *Id.* at 6:5. Nonetheless, a few months later, Patient 2 returned to Dr. Pourkavoos for another exam related to her back pain. *Id.* at 6:17–18. This time, however, Patient 2 did not let Dr. Pourkavoos physically examine her. *Id.* at 6:18. Instead, when Dr. Pourkavoos asked her to lie down, she refused and told him the pain was in the same spot as last time. *Id.* at 6:19–7:14. As a result, "nothing really happened with that exam." *Id.* at 7:16–19.

Patient 2 then had a third exam with Dr. Pourkavoos in May of 2013. *Id.* at 7:21–22. This exam was scheduled because Patient 2 had severe seasonal allergies that caused her to break out in a full body rash that was especially bad on her arms. *Id.* at 7:27–29. Patient 2 informed Dr. Pourkavoos that she has gotten this type of rash since she was five years old and that she needs some kind of medication or ointment to treat it, but Dr. Pourkavoos did not accept this explanation. *Id.* at 8:2–4. Instead, Dr. Pourkavoos asked if the rash was anywhere else, and Patient 2 informed

him that it happens anywhere she sweats, such as in the back of her legs and her lower back. *Id.* at 8:4–6.  Patient 2 informed him that at that time, however, it was only on her arms. *Id.* at 8:6.  Despite this information, Dr. Pourkavoos told Patient 2 to lie down on the table, and that he wanted to check her for a possible latex allergy. *Id.* at 8:9–10.  Patient 2 reported that she informed Dr. Pourkavoos she was not allergic to latex, but she got on the table and allowed Dr. Pourkavoos to examine her. *Id.* at 8:15.  Dr. Pourkavoos proceeded to lift her shirt and look at her stomach without asking for consent.  He then lifted her bra and felt the bottom of her breasts, while explaining that bras have latex in the lining, and he wanted to see if that could be causing the irritation. *Id.* at 8:19–30.  He then pulled down Patient 2's pants so the "crotch" was exposed and began feeling "above the top part of [her] crotch" where the top of her underwear would sit, to ensure any latex in her underwear band was not causing irritation. *Id.* at 9:1–9.  During this entire encounter, Patient 2 never complained of a rash on her breasts or genitals, and Dr. Pourkavoos never asked for permission to touch, nor warned Patient 2 that he was going to be touching, her breasts or genital area. *Id.* at 10:3–7.  Patient 2 expressed that Dr. Pourkavoos never digitally penetrated her as part of the examination. *Id.* at 10:22–26.

Finally, before Detective Espinoza concluded the interview, he and Patient 2 discussed whether Patient 2 would prefer to be classified as a "victim" or a "complaining witness." *Id.* at 30:1–32:30.  Patient 2 initially expressed hesitation at being named a victim and indicated she only wanted to "back up the other girl." *Id.* at 30:8.  After hearing this, Detective Reid informed Patient 2 that as "a victim . . . you kinda, your identity kinda gets kinda protected on stuff like this versus like a witness, your name would be out there as more of a witness." *Id.* at 30:22–24.  After more back and forth, Detective Reid reiterated that if Patient 2 pressed charges, as a victim she would "be confidential almost throughout the whole process." *Id.* at 33:5–6.  He continued that Patient

2 would have more anonymity as a victim than a witness because "they have the right to confront

witnesses." *Id.* at 30:9.  After a little more discussion, Patient 2 ultimately decided that she would

pursue charges and be a "victim," rather than a "witness." *Id.* at 36:1–4.

                                             b.   The Written Statement

After completing their interview of Patient 2, Detectives Espinoza and Reid obtained a

written statement from her as well.  This statement is reproduced in its entirety below.

> I give this statement to Det. Espinoza and Det. Reid of the Avon Police Dept of my own free will without any threats or promises made to me.
>
> I have been a patient of Dr. Khosro Pourkavoos located in Avon for approximately the past 2 years.  My mother recommended Dr. Pourkavoos since he accepts state insurance.  I have had several visits with Dr. Pourkavoos without any incidents.  I have had 2 recent appointments with Dr. Pourkavoos which made me feel very uncomfortable.
>
> The first incident occurred approximately 8 months ago.  I went to Dr. Pourkavoos for lower back pain.  During this exam Dr. Pourkavoos asked where my pain was.  I told him and pointed to my lower back.  Dr. Pourkavoos then had me lie down on my stomach on the exam table[.]  Dr. Pourkavoos was touching my buttocks and kept asking where the pain was, without asking Dr. Pourkavoos pulled my pants down partially exposing my buttocks.  I told Dr. Pourkavoos that the pain was up higher and pointed to the lower back.  He continued to examine my lower back and buttocks and then without warning he pulled down my pants exposing my entire buttocks.  I was not wearing any underwear and I told Dr. Pourkavoos and he responded 'its [*sic*] no problem.'  With both hands Dr. Pourkavoos continued to touch my buttocks.  He continued to touch, spread my cheeks apart and to fondle my buttocks.  I believe this lasted for approximately 5 minutes.
>
> I had my next appointment with Dr. Pourkavoos approximately 2 months later for back pain.  He again wanted me to lie on the examining table for examination but I refused.
>
> My next appointment was in May of 2013.  I have seasonal allergies and had a rash on my arms.  He asked if the rash was in other areas.  I said the rash develops in areas that I sweat.  I told him, however, that the only other place that I had the rash was my upper stomach.  I proceeded to lift my shirt exposing just my stomach area.  He then told me to lie down on my back.  Without warning he lifted my shirt and then lifted up my bra exposing about half of my breasts.  He then touched the lower part of my breasts, feeling around that area for the rash.  During this exam he explained that the rash could be caused by latex contained in the bra and underwear.  He then proceeded to pull down my pants, without warning, exposing my genitals.  I was not wearing underwear.  He then touched and examined the top of my genital area and hips.  I told him that I had not worn underwear for a few days and he explained that some of the rash could still be there.

Dr. Pourkavoos never wears gloves during any of his examinations.  I felt very uncomfortable following this exam and told my mother, my sister [redacted], and my best friend [redacted] about the incident.  I wish to pursue charges against Dr. Pourkavoos for the inappropriate touching that occurred during these two previous examinations.  I swear this statement is the truth to the best of my knowledge.

Patient 2 Written St., ECF No 117-8.

### D.  Preparation of Arrest Warrant Application

At this point, Detective Espinoza began preparing a warrant for the arrest of Dr. Pourkavoos.  What exactly happened as he prepared the warrant is the subject of some debate among the parties.  Detective Espinoza states that he sought and received guidance from then-Assistant State's Attorney Elizabeth Tanaka regarding the investigation, as well as whether it was necessary for him to obtain the opinion of a medical expert prior to arresting Dr. Pourkavoos.  Defs.' L. R. 56(a)1 St., ECF No. 117-1, ¶¶ 36–37.  Defendants further maintain that Detective Espinoza submitted at least one draft of the warrant application to a "reviewing prosecutor" that was returned for revision, prior to obtaining a warrant for Dr. Pourkavoos' arrest.  *Id.* ¶ 38.  Dr. Pourkavoos does not dispute that Detective Espinoza testified to the aforementioned statements during his deposition, but he argues that Attorney Tanaka does not remember having any of the conversations referenced by Detective Espinoza, nor does she remember returning a warrant application to him for further revision.  Pls.' L. R. 56(a)2 St. ¶¶ 37–39.

The affidavit Detective Espinoza submitted in support of the arrest warrant relayed the following events.[6]  In June of 2013, Patient 1 came to the APD to report that she had been sexually assaulted during a visit with Dr. Pourkavoos.  ECF No. 131-10 ¶ 2.  Patient 1 met with Officer

---

[6] Detective Espinoza drafted and submitted two different arrest warrant applications, and corresponding affidavits, one relating to Patient 1 and another for Patient 2.  The only difference between the two, however, was the cover sheet detailing the charges on which Detective Espinoza sought to arrest Dr. Pourkavoos.  *Compare* ECF No. 131-10 *with* ECF No. 131-11.  As the statements of fact are the same in both applications, the Court will refer only to ECF No. 131-10, the warrant and affidavit submitted in relation to Patient 1, and will refer to the affidavit, in singular form, throughout the remainder of this opinion.

Lundell and relayed a short version of what took place between her and Dr. Pourkavoos.  *Id.* ¶ 3. The investigation of this incident was subsequently assigned to Detective Espinoza.  *Id.* ¶ 4. Thereafter, Detective Espinoza believed that it would be necessary to obtain a written statement from Patient 1 regarding her experience.  *Id.*  He contacted Patient 1 and scheduled an interview for July 8, 2013.  *Id.*

The affidavit notes that, at this interview, Patient 1 relayed that Dr. Pourkavoos had been her doctor for approximately two years, and that Patient 1 was "usually accompanied by either a friend or a family member" during her several visits to his office.  *Id.*  ¶ 5.  The affidavit went on to relate what Patient 1 said had happened to her during her May and June 2013 visits with Dr. Pourkavoos.  Specifically, the affidavit states that during Patient 1's appointment in May of 2013, Patient 1 stated she was suffering from a "skin rash that had spread to her forearms and legs."  *Id.* ¶ 5.  The affidavit states that, during this examination, Dr. Pourkavoos "touched and fondled . . . her buttocks and breasts."  *Id.*  The affidavit continues that Dr. Pourkavoos attempted to move Patient 1's "thighs apart and commented that 'I have to check'" the area between her legs.  *Id.* According to the affidavit, Patient 1 informed Dr. Pourkavoos that her husband had already checked there, but Dr. Pourkavoos stated that "I have to check anyway."  *Id.*  He then moved her thighs and examined her vagina by spreading the vagina open.  *Id.*  Dr. Pourkavoos then ordered blood tests and told her to return for a follow up examination.  *Id.*  Patient 1 reported that his actions during this appointment made her feel uncomfortable.  *Id.*

The affidavit then moves on to Patient 1's next appointment with Dr. Pourkavoos on June 26, 2013, and states as follows.  *Id.*  The June 26, 2013, visit was scheduled to address the blood results from the previous appointment, as well as Patient 1 feeling tired from her anemia and suffering from some paralysis in her legs.  *Id.*  Patient 1 was not accompanied by anyone during

this visit. *Id.* Dr. Pourkavoos instructed her to undress, but she kept her bra and underwear on. *Id.* While in a sitting position, Dr. Pourkavoos began to examine her spine, then unhooked her bra and made a comment about scoliosis. *Id.* Dr. Pourkavoos then had Patient 1 lie down on her front, said he was going to check for constipation, pulled down her underwear, and "inserted one finger into her anus and one finger into her vagina." *Id.* While Patient 1 had been given constipation exams by other doctors, this one "was different." *Id.* The affidavit continues by stating: "Dr. Pourkavoos' exam lasted longer and [Patient 1] could feel his fingers moving in a strange sexual manner." *Id.* The affidavit further states that Patient 1 "felt sexually violated" by the exam and, immediately after leaving the office, called her mother, husband, and psychiatrist to attempt to report what had happened. *Id.*

The affidavit continues by disclosing the following interactions with Patient 1 after the interview. Detective Espinoza attempted to contact Patient 1 to inform her that she needed to sign a release form to allow him to meet with her psychiatrist and victim's advocate. *Id.* ¶ 6. Patient 1 did not answer the phone call, and Detective Espinoza left a voicemail message to this effect. *Id.* Patient 1 returned Detective Espinoza's call on July 25, 2013, and left a rambling, at times incoherent, voicemail message. *Id.* She did not request a meeting and it is unclear whether Detective Espinoza followed up on this message. *Id.* Patient 1 left a second voicemail the next day apologizing for the prior voicemail and promising to answer future calls. *Id.*

The warrant affidavit further relates the following information about Patient 1's mental health history that Detective Espinoza learned from her psychiatrist. Patient 1 suffered from several mental health issues that Detective Espinoza referenced in the affidavit. *Id.* ¶ 7. She was, at that time, prescribed and taking several mental health medications. *Id.* Patient 1 had been hospitalized for a mental health issue in June of 2012. *Id.* During this hospitalization, Patient 1

made false statements to the hospital staff regarding whether her psychiatrist believed that she could be released from the hospital. *Id.* Patient 1 was hospitalized again in February of 2013, this time because she attempted suicide by overdose of a prescription medication; her suicide attempt was triggered by a crisis in her marriage. *Id.* The affidavit also stated that Patient 1 had called her psychiatrist on June 26, 2013, and told him that Dr. Pourkavoos "had sexually violated her during an exam." *Id.* The psychiatrist advised Patient 1 to file a report "perhaps with a local medical board." *Id.* The affidavit further noted that the psychiatrist believed Patient 1's "accusation regarding Dr. Pourkavoos [is] credible." *Id.*

The affidavit then notes that Detective Espinoza followed up with Patient 1's victim advocate from the Susan B. Anthony Project. *Id.* ¶ 8. The victim advocate reported that she was not aware of Patient 1 using illegal narcotics or abusing her prescription medication. *Id.* She further reported that Patient 1 had previously contacted the Susan B. Anthony Project on February 1, 2013, inquiring about services and sexual assault group meetings and on March 7, 2013, inquiring about general counseling. *Id.* Regarding the events with Dr. Pourkavoos, the advocate stated that she believed that Patient 1's account was "credible" because "her account had not changed during several interviews and conversations." *Id.*

The affidavit then listed Patient 1's 2007 conviction for forgery in the second degree. *Id.* ¶ 9.

The affidavit then goes on to describe the interview with Dr. Pourkavoos. *Id.* ¶ 10. This section is relatively short and simply states that Dr. Pourkavoos confirmed he does not always have other staff present when patients are required to remove clothing, including during rectal exams. *Id.* The affidavit further states that Dr. Pourkavoos denied examining Patient 1's vaginal area or touching her inappropriately. *Id.*

The affidavit then discusses how Detective Espinoza located Patients 2 and 3,[7] before discussing the interviews he conducted with them.[8]  *Id.* ¶¶ 11–13.  The affidavit first addresses the interview with Patient 2.  *Id.* ¶ 14.  It states that Patient 2 reported that she had two appointments that made her uncomfortable.  *Id.*  Specifically, she saw Dr. Pourkavoos approximately eight months prior to the interview for lower back pain.  *Id.*  During this exam, Dr. Pourkavoos had her lie on her stomach and began touching her "buttocks and kept asking about the location of the pain."  *Id.*  Dr. Pourkavoos then, without notice, pulled down Patient 2's "pants partially exposing her buttocks."  *Id.*  Patient 2 informed Dr. Pourkavoos the pain was higher than that and pointed to her lower back, but Dr. Pourkavoos continued to examine her lower back and buttocks.  *Id.*  Dr. Pourkavoos then pulled down her pants further to reveal her entire buttocks and when Patient 2 informed him that she was not wearing any underwear he responded, "its [sic] no problem."  *Id.*  The affidavit then states, "Dr. Pourkavoos then used both hands to touch and fondle her buttocks" and "spread the cheeks of her buttocks apart."  *Id.*  The affidavit continues that Patient 2 reported this part of the exam appeared to last an unusually long time, which she believed was about five minutes.  *Id.*

The affidavit then moves on to what it refers to as the "second incident" with Patient 2 that took place in approximately May of 2013.  *Id.*  This was another appointment made by Patient 2, this time for Dr. Pourkavoos to examine a rash on her arms.  *Id.*  At this appointment, Dr. Pourkavoos asked if the rash was in other areas, and Patient 2 informed him that it "develops in

---

[7] In the affidavit docketed at ECF No. 131-10, the person that this ruling refers to as Patient 1 is referred to as "Victim #1 (13-5557)," the person that this ruling refers to as Patient 2 is referred to as "Victim #1 (13-10000), and the person that this ruling refers to as Patient 3 is referred to as "Victim #2 (13-10000).  This appears to be the case because APD used two separate case numbers:  13-5557 pertaining to Patient 1, and 13-10000, pertaining to Patients 2 and 3.

[8] In this section, in addition to describing the post that led him to identify Patients 2 and 3, Detective Espinoza describes a separate anonymous comment left on a medical search engine website in October of 2010 that claims Dr. Pourkavoos "insisted on doing anal probes with his fingers on at least 3 visits" despite that the alleged patient had "never had any problems" with his or her rectum.  *Id.* ¶ 11.  The same post referenced that a friend had "also had this issue with him."  *Id.*  The affidavit does not mention any follow-up concerning this comment.

areas where she sweats but that at this time the only other place the rash was present was on her upper stomach." *Id.* She then showed this to Dr. Pourkavoos by lifting her shirt. *Id.* Dr. Pourkavoos responded by asking her to lie back on the table and then, without warning, lifted her shirt, exposing her bra and approximately half of her breasts. *Id.* Dr. Pourkavoos then touched the lower parts of her breasts while explaining that the rash could be caused by the latex contained in her bra and underwear. *Id.* Dr. Pourkavoos then proceeded, without warning, to pull down Patient 2's pants, "exposing her genitals." *Id.* He then "touched and examined" the top of her genital and hip area. *Id.* During this portion of the exam, Patient 2 informed Dr. Pourkavoos that she had not worn underwear for the past few days, but Dr. Pourkavoos informed her that the rash could still be present. *Id.*

The affidavit then moves on to a discussion of the interview with Patient 3. *Id.* ¶ 15. This section relays that during her last two appointments with Dr. Pourkavoos, Patient 3 had felt uncomfortable. *Id.* Specifically, the affidavit states that Patient 3 made an appointment with Dr. Pourkavoos for him to examine a "scar on her wrist." *Id.* After examining this issue, Dr. Pourkavoos asked if she had any other medical issues and she responded that she had a birthmark on her back. *Id.* Dr. Pourkavoos then asked Patient 3 to remove her sweatshirt, which she did, despite that she was wearing only a bra underneath. *Id.* While examining her back, Dr. Pourkavoos asked if she had any other issues, to which she responded that she did not. *Id.* Despite this answer, Dr. Pourkavoos continued his examination by touching her upper chest area and then lifted each side of her bra, exposing her nipples. *Id.*

The affidavit goes on to describe that the second incident took place at Patient 3's next appointment with Dr. Pourkavoos, approximately two or three months later. *Id.* This appointment was made because Patient 3 was sick with what she believed was bronchitis. *Id.* During the

examination, Dr. Pourkavoos asked her to remove her sweatshirt so he could listen to her lungs. *Id.* Patient 3 did this, but was wearing only a sports bra under her sweatshirt. *Id.* Dr. Pourkavoos then used a stethoscope on her back before moving the stethoscope toward her chest, and then lower toward her breasts. *Id.* Then, without saying anything, Dr. Pourkavoos "lift[ed] her bra with one finger, fully exposing her breasts." *Id.* He then continued the examination by touching the top of Patient 3's breasts. *Id.*

Based on these allegations, Detective Espinoza submitted two warrant applications for the arrest of Dr. Pourkavoos. Related to Patient 1, he sought to arrest Dr. Pourkavoos for the crimes of sexual assault in the second degree for the events during the June 26, 2013, appointment, and sexual assault in the fourth degree for the events during the May 2013, appointment. Related to Patient 2, he sought to arrest Dr. Pourkavoos on two counts of sexual assault in the fourth degree for the events of the appointment that occurred approximately eight months prior to Patient 2's interview and the events of the appointment in May of 2013.[9]

Under the relevant provisions of Connecticut law, "[a] person is guilty of sexual assault in the second degree when [i] such person engages in sexual intercourse with another person and . . . [ii] the actor accomplishes the sexual intercourse by means of false representation that the sexual intercourse is for a bona fide medical purpose by a health care professional." Conn. Gen. Stat. § 53a-71(a). A "person is guilty of sexual assault in the fourth degree when . . . [i] such person subjects another person to sexual contact and [ii] accomplishes the sexual contact by means of false representation that the sexual contact is for a bona fide medical purpose by a health care professional." *Id.* § 53a-73a(a)(5). Connecticut law further provides that "penetration, however slight" constitutes "sexual intercourse," but contact is only considered "sexual contact" where it is

---

[9] Detective Espinoza did not seek an arrest warrant for Dr. Pourkavoos based on the events involving Patient 3.

"for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating" the victim. *Id.* § 53(a)-65(2) & (3).

### E.   Arrest of Dr. Pourkavoos and Subsequent Proceedings

It is undisputed that these applications for arrest warrants were ultimately signed by both Attorney Tanaka and an unnamed judge of the Connecticut Superior Court. *See* ECF No. 131-10; ECF No. 131-11.

After the warrants were issued, Dr. Pourkavoos was arrested and charged with one count of sexual assault in the second degree, relating to Patient 1's June 26, 2013, visit, and three counts of sexual assault in the fourth degree, relating to Patient 1's May of 2013 visit; Patient 2's May of 2013 visit; and Patient 2's visit approximately eight months earlier. *Id.* at 9.

Dr. Pourkavoos' criminal case was pending for nearly two years; then, after speaking to "a medical doctor who is very well respected," the State of Connecticut decided to *nolle prosequi* all of the charges based on an inability "to prove the elements of the crimes beyond a reasonable doubt." Sept. 22, 2016, Connecticut Superior Court Hearing Tr., ECF No. 129-2 at 2:10–14. Despite this outcome in the criminal case, as well as having been exonerated by the Department of Public Health, Dr. Pourkavoos voluntarily surrendered his medical license and is no longer a practicing physician. Pl.'s L. R. 56(a)2 St. ¶ 46.

## II.   PROCEDURAL HISTORY

Plaintiffs initiated this action in January of 2017, alleging claims for violation of Dr. Pourkavoos' Fourth Amendment rights (as applicable to Detective Espinoza, a local police officer, through the Fourteenth Amendment), negligence, indemnification, municipal liability,[10] and for Dr. Hakim-Zargar's loss of consortium. Compl., ECF No. 1, at 33–41. Defendants answered and

---

[10] Plaintiffs later dropped the municipal liability claim.

then filed a motion for judgment on the pleadings, asserting, among other things, that they were entitled to qualified immunity.

The Court (Covello, J.), denied Defendants' motion for judgment on the pleadings, holding that there were questions of fact concerning the information available to Detective Espinoza at the time he signed the warrant affidavit and concerning the materiality of the alleged omissions or misrepresentations in Detective Espinoza's warrant affidavit that precluded a determination of qualified immunity at that juncture.  ECF No. 52 at 26.  Defendants appealed.  On September 24, 2020, the Second Circuit affirmed Judge Covello's decision on the motion for judgment on the pleadings.  ECF No. 62.  Following the Second Circuit's decision, which is discussed further below, Plaintiffs filed a Second Amended Complaint on consent, which is the operative complaint. ECF No. 123.  The case was transferred to the undersigned, and Defendants filed the present motion for summary judgment.

Defendants argue that each of Plaintiffs' claims fails for assorted reasons.  Specifically, Defendants believe the Fourth Amendment false arrest claim brought under § 1983 fails because Detective Espinoza had probable cause to arrest Plaintiff.  Even if he did not, however, Defendants believe he had at least arguable probable cause such that he is protected by qualified immunity. Defendants further argue that Dr. Pourkavoos' claim for negligence is barred by the statute of limitations, as well as governmental immunity.  Further, they contend that his claim for indemnification is barred by the statute of limitations and his failure to abide by Conn. Gen. Stat. § 7-465.  Finally, Defendants argue that the final claim for loss of consortium must also fail, because all of Dr. Pourkavoos' claims fail.  Each contention is addressed below.

### III.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial. It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. If the non-movant fails "to make a sufficient showing on an essential element of [their] case with

respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

When examining the record, "the court must resolve all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992). "[O]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## IV.    COUNT ONE:  FALSE ARREST UNDER 42 U.S.C. § 1983

In order to succeed on a Fourth Amendment claim for false arrest under 42 U.S.C. § 1983, "a plaintiff must establish: '(1) the defendant intentionally arrested him or had him arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent to the arrest; and (4) the arrest was not supported by probable cause.'" *Sharnick v. D'Archangelo*, 935 F. Supp. 2d 436, 443 (D. Conn. 2013) (internal citations omitted).  It has long been established that "a § 1983 claim of false arrest based on the Fourth Amendment right to be free from unreasonable seizures may not be maintained if there was probable cause for the arrest." *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002); *see also Jenkins v. City of New York*, 478 F.3d 76, 84–85 (2d Cir. 2007) (holding that the existence of probable cause to arrest is a complete defense to a Section 1983 action for false arrest).

Defendants' motion for summary judgment, as it relates to the alleged Fourth Amendment violation, is based almost entirely on the single premise that "the record evidence establishes beyond dispute that three women swore formal complaints to Detective Espinoza, that Dr. Pourkavoos had engaged in inappropriate sexual contacts with them during the course of examinations, without their consent." ECF No. 117 at 1.  Defendants contend that these statements constitute probable cause, which allowed Detective Espinoza to apply for and receive an arrest

warrant for Dr. Pourkavoos.  Defendants conclude that the existence of this probable cause defeats Plaintiffs' false arrest claim; relying solely on this argument, they address no other elements of a § 1983 claim.  Thus, the Court's analysis of Count One will address only whether there was probable cause to arrest Dr. Pourkavoos, and will assume, for purposes of summary judgment, that the other elements of the claim are met.

A. <u>Legal Standard</u>

Probable cause to arrest exists "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  The Court begins its analysis with the arrest warrant, as "an arrest pursuant to a facially valid arrest warrant is presumed to be made with probable cause." *Martinetti v. Town of New Hartford*, 12 F. App'x 29, 32 (2d Cir. 2001) (summary order).

In order to overcome this presumption, a plaintiff must show the officer who obtained the warrant "knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, and that such false or omitted information was necessary to the finding of probable cause." *Kaskel v. Compagnone*, 664 F. App'x 109, 110 (2d Cir. 2016) (summary order) (citing *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993)).  To evaluate such a claim, the Court "put[s] aside allegedly false material, suppl[ies] any omitted information, and then determin[es] whether the contents of the 'corrected affidavit' would have supported a finding of probable cause." *Id.* at 110–111.  Further legal principles are discussed below.

B.  Misrepresentations and Omissions

The materiality of misrepresentations and omissions in a warrant is a mixed question of law and fact. *Velardi v. Walsh*, 40 F.3d 569, 574 (2nd Cir. 1994).  Initially, the Court determines as a matter of law "whether the [misrepresentations or omissions are] relevant to the probable cause determination." *Id.*  Before such an analysis can be completed however, the Court must determine whether there are, in fact, misrepresentations or omissions.[11]  Upon examination of the record, the Court concludes that Detective Espinoza failed to include or mischaracterized information in the affidavit in support of the arrest warrant in this case. This becomes clear after a comparison of the Patients' audiotaped interviews with their written statements, and after further comparison of the written statements to Detective Espinoza's arrest warrant applications.

First, Plaintiffs have pointed to misrepresentations and omissions in the warrant application concerning Patient 1's May 2013 appointment with Dr. Pourkavoos.  The parties agree that Patient 1 reported the following to Detective Espinoza about that appointment.  First, she went to Dr. Pourkavoos in May of 2013 to be seen for a rash that had appeared on her arms and legs.  Patient 1 Interview Tr., ECF No. 117-13 at 3:18–23.  When she got to his office, Dr. Pourkavoos looked at her arms and legs, as well as "pushed around" other parts of her body. *Id.* at 4:1–5.  Patient 1 then told Detective Espinoza that Dr. Pourkavoos squeezed her breasts, but clarified that she informed Dr. Pourkavoos that she had a lump in one of her breasts, which Dr. Pourkavoos confirmed he felt. *Id.* at 4:21–24.

The parties also do not dispute that, when Detective Espinoza wrote Patient 1's written statement for her signature, he wrote that "Dr. Pourkavoos proceeded to examine me by touching

_____

[11] Here, the parties do not dispute what was said by the Patients, what was put into their written statements, what was known to Detective Espinoza, and ultimately what was put into the warrant affidavit. Therefore, the Court concludes that there are misrepresentations and omissions based on the undisputed facts.

*and fondling* my buttock and breasts."  Patient 1's Written St., ECF No. 117-4 at 2 (emphasis added).  This is the same language used by Detective Espinoza in the affidavit in support of the arrest warrant.  ECF No. 131-10 at 4.  It is clear from a review of the interview transcript, however, that Patient 1 did not actually use the word "fondle" to describe Dr. Pourkavoos' actions concerning her buttocks and breasts.  Instead, in the Court's review, she used the words "pushed around" and "squeezed."  The word "fondling" was added by Detective Espinoza in the written statement and then subsequently carried over into the warrant affidavit, and is therefore a misrepresentation of Plaintiff's interview.[12]  Further, neither the written statement nor the warrant application included that Patient 1 had informed Dr. Pourkavoos that she had a lump in her breast during his breast examination; this is an omission.

Next, the warrant affidavit mischaracterized the part of Patient 1's body Dr. Pourkavoos examined during her May 2013 appointment.  The interview transcript relates that, during her interview, Patient 1 initially stated that Dr. Pourkavoos spread her legs and looked at her vagina. Patient 1 Interview Tr., ECF No. 117-13 at 4:15–19.  Later in the interview, however, when Detective Espinoza was confirming what Patient 1 had said in order to include it in her written statement, it appears he attempted to confirm that Dr. Pourkavoos did in fact examine her vagina. This led to Patient 1 stating:  "my vagina, the, the, what do you call, your, there's your labia and then . . . it's *not my vagina*, I don't know."  *Id.* at 63:5–9 (emphasis added).  It is undisputed, however, that Patient 1's written statement and the affidavit in support of the arrest warrant—both of which were written by Detective Espinoza—state "Dr. Pourkavoos then moved [Patient 1's] thighs apart and *examined her vagina* by spreading the vagina open."  ECF No. 117-2 ¶ 5 (emphasis added).  Thus, Detective Espinoza's warrant application mischaracterized in what area

---

[12] While the report memorializing Patient 1's initial contact with the APD about this incident uses the word "fondle," there is no dispute that Patient 1 did not use that word during her lengthy interview with Detective Espinoza.

Dr. Pourkavoos had examined Patient 1 because she expressly disclaimed in her interview that he had examined her vagina—but the affidavit made no mention of this clarification.

Further, the statements in the warrant affidavit regarding the June 2013 incident with Patient 1 contained a significant omission regarding prior treatment for constipation. Patient 1's interview transcript relates that, during Patient 1's interview, she told Detective Espinoza that she had informed Dr. Pourkavoos at the June 2013 visit that she had been feeling weak, sleeping an excessive amount, and having issues with her legs. ECF No. 117-13 at 9:21–23. Patient 1 further informed Detective Espinoza that, despite not actively complaining about constipation at that appointment, Dr. Pourkavoos had written her a prescription for constipation medication in the past. *Id.* at 11:1–26. Patient 1 then informed Detective Espinoza that Dr. Pourkavoos simultaneously inserted his fingers into her anus and vagina. *Id.* at 14:3–15. It is undisputed that, when this interview was summarized for the written statement and affidavit in support of the arrest warrant, however, Detective Espinoza did not include the information that Dr. Pourkavoos had previously treated Patient 1 for constipation in either document. *See* Patient 1's Written St., ECF No. 117-4; ECF No. 131-10. The Court concludes Detective Espinoza omitted the information about prior treatment for constipation.

Perhaps most importantly, on at least one occasion, Detective Espinoza inserted words sexualizing the actions taken by Dr. Pourkavoos that were not used by Patient 1. Specifically, the affidavit states that Patient 1 reported Dr. Pourkavoos' fingers were "moving in a strange sexual manner" and that she "felt sexually violated." ECF No. 117-2 ¶ 5. But these words appear nowhere in the nearly two-hour interview Patient 1 gave to Detective Espinoza. *See* ECF No. 117-13. Additionally, it is undisputed that the sworn written statement signed by Patient 1 states only that Dr. Pourkavoos' fingers moved "around in a strange way." ECF No. 117-4 at 4. The addition

of the qualifying word "sexual" to describe how Dr. Pourkavoos' fingers moved constituted a misrepresentation of Patient 1's description of the events.

Detective Espinoza also omitted certain necessary context to some of Patient 1's statements. Specifically, during her interview with Detective Espinoza, Patient 1 indicated that while she was alone during the two particular appointments in question, she sometimes gets overwhelmed during medical appointments and therefore often brings someone else with her so that person can remember what was said. Patient 1 Interview Tr., ECF No. 117-13 at 6:16–22. Patient 1 clarified later in the interview that she did not "want people thinking that I, I, I only went to him once by myself and then --." *Id.* at 43:28–29. Despite this request, Detective Espinoza's written statement for Patient 1 simply states that Patient 1 was "usually accompanied by friends and family," but "was not accompanied by anyone during this appointment," with no mention that the May 2013 appointment was not the first appointment Patient 1 attended alone. ECF No. 117-4 at 2, 3. The arrest warrant affidavit, likewise, omitted that Patient 1 specifically did not wish to create an impression that Dr. Pourkavoos assaulted her the first time she attended an appointment alone. This omission could have given the reviewing judge the impression that, at the first appointment where Patient 1 was alone with Dr. Pourkavoos, he attempted to assault her. This impression, however, is expressly the opposite of what Patient 1 was attempting to convey. See Patient 1 Interview Tr., ECF No. 117-13 at 43:28–29. Thus, this omission appears to have changed the meaning of Patient 1's statement.

Because the warrant affidavit contained these omissions and misrepresentations, the Court will continue to the next prong of the analysis. [13]

---

[13] Plaintiffs extensively argue that the interview of Dr. Pourkavoos utilized certain tactics and methods to obtain specific responses the interviewing Detectives wanted. Plaintiffs have not, however, provided the Court any legal authority that such methods must be disclosed in a warrant application before information obtained in such an

C.  Materiality of Omissions and Misrepresentations

The Court next turns to whether these misrepresentations and omissions were "necessary to a finding of probable cause." *Ganek v. Leibowitz*, 874 F.3d 73, 82 (2d Cir. 2017).  To do this, the Court considers a "hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." *Id.*  As discussed above, the materiality of these misrepresentations and omissions is a mixed question of law and fact, where the Court determines as a matter of law "whether the information is relevant to the probable cause determination." *Velardi*, 40 F.3d at 574.  Once the Court determines the information is relevant, "the weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful cases." *Id.*  But if the evidence, viewed in the light most favorable to the plaintiff, "discloses no *genuine* dispute that a [judge] would have issued the warrant on the basis of the corrected affidavit," summary judgment is appropriate. *Id.* (emphasis in original). *See also Walczyk v. Rio*, 496 F.3d 139, 158 (2d Cir. 2007) (applying *Velardi* in arrest warrant context).

Here, the Court has no trouble concluding that the omissions and misrepresentations Detective Espinoza made in the warrant affidavit are relevant to the determination of whether there was probable cause to arrest Dr. Pourkavoos.  Each of the examined omissions and misrepresentations was relevant because they bore directly on what happened at the appointments with Dr. Pourkavoos and what words the witnesses used to describe those events, and they pertained to whether the elements of the alleged crimes had been met.  This is not a case in which the evidence, viewed in the light most favorable to Dr. Pourkavoos, discloses no genuine dispute that a judge would have issued the warrant on the basis of an affidavit that corrected the potential

---

interview can be used in that application.  Thus, the Court does not believe the inclusion of information obtained through the interview with Dr. Pourkavoos was inappropriately misleading.

misrepresentations and omissions. *See Velardi*, 40 F.3d at 574. Rather, if these potential misrepresentations and omissions were corrected in a hypothetical new affidavit, a judge may indeed think twice about whether probable cause existed to arrest Dr. Pourkavoos on sexual assault charges. At the very least, there is a question of fact about how much weight a judge would have placed on the information in making the probable cause determination. This is precisely the type of "doubtful case[]" that *Velardi* dictates is inappropriate for summary judgment. *See Velardi*, 40 F.3d at 574 n.1 (the question of whether a reviewing judge presented with all the correct and relevant information would have found probable cause is one of fact). Therefore, Defendants' motion for summary judgment based on Detective Espinoza's reliance on the arrest warrant cannot be granted. *See Stonick v. Delvecchio*, 438 F. Supp. 3d 154, 166 (D. Conn. 2020) (denying summary judgment where questions of fact existed as to whether corrected warrant affidavit contained probable cause).[14]

### D. Knowing or Reckless Misrepresentations

Finally, there is a material question of fact whether these misrepresentations and omissions were made knowingly, intentionally, or recklessly. *See Conroy v. Caron*, 275 F. Supp. 3d 328, 347 (D. Conn. 2017) (finding that genuine issues of material fact existed with respect to whether an officer intentionally or recklessly made false statements in a search warrant application). A reasonable jury could conclude that Detective Espinoza made these misrepresentations and omissions at least recklessly, and perhaps knowingly and intentionally. For instance, a jury could determine that the number of misrepresentations and omissions, and the nature of those

---

[14] Defendants spend nearly ten pages of their memorandum in support of their motion for summary judgment arguing that Detective Espinoza had probable cause to arrest Dr. Pourkavoos, apparently independent of the arrest warrant. ECF No. 117 at 23–33. Nowhere in that argument, however, do Defendants provide any legal support for the proposition that it is appropriate for the Court to engage in a plenary review of whether probable cause existed outside the confines of the warrant application. Nor has the Court been able to locate any authority to support this idea. Indeed, at oral argument, Defendants retreated from the position in their briefing that the Court should examine whether probable cause existed irrespective of the warrant. Thus, the Court discusses the issue no further.

misrepresentations and omissions, suggests Detective Espinoza acted at least recklessly.  A jury could also conclude that Detective Espinoza either recklessly or intentionally omitted mention of Patient 1's prior treatment for constipation, in order to remove a suggestion that the internal examination had a *bona fide* medical purpose, which is pertinent to the sexual assault charges at issue.  Further, a jury could find that he either recklessly or intentionally stated that Dr. Pourkavoos had examined Patient 1's vagina in the May appointment in order to bolster the idea that Dr. Pourkavoos had sexually assaulted her at that appointment, when she in fact expressly disclaimed that idea in her interview.  The jury could further find that Detective Espinoza at least implied, contrary to Patient 1's statements, that Dr. Pourkavoos assaulted her the first time she attended an appointment alone.  Finally, a reasonable jury could conclude that Detective Espinoza acted recklessly or intentionally in inserting sexually charged words such as "fondle," "strange sexual manner," and "sexually violated" into the warrant affidavit when Patient 1 did not herself use these words, in order to increase the chances that the reviewing prosecutor and judge would authorize issuance of the requested warrants.  The inclusion of this sexualized language is particularly relevant with respect to the allegations pertaining to sexual assault in the second degree, which requires a showing that the act was done for the purpose sexual gratification of the actor or for the purpose of degrading or humiliating the victim.  Conn. Gen. Stat. § 53(a)-65(2) & (3).[15]  Notably, recklessness is inferred when the omitted information "was clearly critical to the determination of probable cause."  *McColley v. Cnty. Of Rensselaer*, 740 F.3d 814, 823 (2d Cir. 2014).

---

[15] In this vein, the record also contains evidence from which a jury could conclude that Detective Espinoza prompted Patient 2 to describe Dr. Pourkavoos' manipulation of her buttocks as "fondling," when she had instead used the less sexually charged word "pushing."  During her interview, Patient 2 described that Dr. Pourkavoos was "pushing" on her butt cheeks.  Patient 2 Interview Tr., ECF No. 117-16 at 4:19–22.  In response to this, Detective Espinoza asked Patient 2 if Dr. Pourkavoos was "fondling" her.  *Id.* at 4:24.  In the Court's review, the written statement for Patient 2 states that Dr. Pourkavoos "fondle[d] [her] buttocks," ECF No. 118-8, and the affidavit in support of the warrant contains language that "Patient 2 stated" Dr. Pourkavoos "fondle[d] her buttocks."  ECF No. 131-11 ¶ 14.  But there appears to be no indication in either the written statement or the warrant application that *Detective Espinoza*, rather than Patient 2, had first proposed using the word "fondle."

Defendants do not argue in the instant motion that any alleged misrepresentation or omission was made unknowingly or unintentionally. But the determination of Detective Espinoza's state of mind will necessarily involve evaluation of his testimony, including his demeanor and credibility—matters best suited for the jury.

### E. Qualified Immunity

Even if Defendants are not entitled to summary judgment based on the presence of probable cause to arrest Dr. Pourkavoos, they may still be entitled to summary judgment based on qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity defense has evolved to provide "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The United States Supreme Court has established a two-pronged test governing the qualified immunity defense. Under the first prong, a court "must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right." *Pearson v. Callahan,* 555 U.S. 223, 232, (2009). Under the second prong, "the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* A police officer's conduct "violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "An official is therefore entitled to immunity if his action was 'objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.'" *Taravella v. Town of Wolcott*, 599

F.3d 129, 133 (2d Cir. 2010) (quoting *X–Men Sec., Inc. v. Pataki*, 196 F.3d 56, 66 (2d Cir. 1999)). A court may use its discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

### 1.  Arguable Probable Cause

Defendants argue, under the first prong of the qualified immunity analysis, that they are entitled to qualified immunity because Detective Espinoza had at least arguable probable cause to arrest Dr. Pourkavoos.  In a false arrest case, an officer is entitled to qualified immunity if he can show there was "arguable probable cause." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.*  Defendants argue both that it was objectively reasonable for Detective Espinoza to believe probable cause existed, and that reasonable officers could disagree on this issue.

Before examining how these two tests for the existence of arguable probable cause apply here, the Court notes a tension, identified by Judge Calabresi in his concurring opinion in *McColley*, 740 F.3d at 831 (Calabresi, J., concurring), between the Second Circuit's qualified immunity jurisprudence and its corrected warrant affidavit jurisprudence.  As Judge Calabresi explained:

> On the one hand, some of our cases do say that determining the weight a magistrate would give omitted evidence is a question of fact.  And that question eludes summary judgment if, but only if, reasonable factfinders could disagree about the answer—that is, about whether probable cause would still be found.  Yet, if reasonable people disagree about the existence of probable cause, then *arguable* probable cause has, by definition, been established under others of our cases!  Since *arguable* probable cause exists whenever reasonable people disagree about the existence of *actual* probable cause, no case of this sort should ever go to a jury.

Either a court will decide probable cause (one way or the other) as a matter of law, or the court will find that probable cause is open to reasonable dispute and will on that basis dismiss the case, again as a matter of law, on qualified immunity grounds. But to continue around the circle of our cases, this, of course, conflicts with the clear holding of *Velardi* that "doubtful cases" must be sent to a jury.

*Id.* (internal citations omitted). Ultimately, *McColley* did not resolve this tension, and the Court has found no Second Circuit opinions since that have addressed the conflicting guidance.[16] As noted above, this Court has concluded that the omissions and misrepresentations in the warrant affidavit submitted by Detective Espinoza were relevant, and, under *Velardi*, has concluded that the weight a neutral judge examining the warrant would give to the omitted and misrepresented facts is a question of fact for the jury. As Judge Calabresi's concurrence explains, this predicate finding could be construed, almost automatically, as the existence of arguable probable cause— which would entitle Detective Espinoza to qualified immunity. But, in the Court's review, there is no binding Second Circuit law at this time that goes this far, nor do Defendants argue there is. Instead, the Court must apply the two tests for arguable probable cause articulated in *Escalera*. In so doing, it has the benefit of the Second Circuit's earlier opinion on these very issues in this very case, which guides the Court's analysis here.

More than two years ago, the Second Circuit affirmed this Court's (Covello, J.) decision that Detective Espinoza was not entitled to judgment on the pleadings based on qualified immunity. *Pourkavoos v. Town of Avon*, 823 F. App'x 53, 60 (2d Cir. 2020) (summary order). In its ruling, the Second Circuit determined (at least implicitly) that, taking the allegations of the complaint as true, it was not objectively reasonable for Detective Espinoza to believe that probable cause existed, because his "omissions and fabrications are material." *Id.* The Second Circuit noted

---

[16] While the Second Circuit has not yet resolved this dispute, trial courts in this district have continued to note and subsequently grapple with these apparently conflicting lines of cases. *See Stonick*, 438 F. Supp. 3d at 167–68; *Siddiqui v. Rocheleau*, No. 3:18-CV-00839 (JCH), 2019 WL 12239678, at *6 n.6 (D. Conn. May 15, 2019).

that, again taking the allegations of the complaint as true, Detective Espinoza had omitted facts relevant to the *bona fide* medical purposes of Patient 1's rectal examination and Patient 2's buttocks examination, which may have defeated a finding of probable cause had they been included. *Id.* It further recognized that the affidavit did not contain "*any* information regarding the 'gratification' element of sexual contact" relevant to the three second degree sexual assault charges. *Id.*

This Court now holds that the questions of material fact discussed above regarding what weight a judge would have placed on the potentially misrepresented and omitted information preclude a finding, as a matter of law, that it was objectively reasonable for Detective Espinoza to believe that probable cause existed. Specifically, as discussed above, genuine questions remain as to whether the potentially omitted and misrepresented information was necessary to the finding of probable cause. *See Escalera*, 361 F.3d at 743 (noting that, if there are questions of fact concerning whether the corrected affidavit would support a reasonable officer's belief that probable cause existed, qualified immunity is inappropriate). In so holding, this Court finds the Second Circuit's earlier analysis of the issue persuasive. While this Court recognizes that a motion for judgment on the pleadings and a motion for summary judgment employ different evidentiary standards, Dr. Pourkavoos had attached nearly all of the relevant evidence, including all the Patients' interview transcripts, the Patients' written statements, and the affidavit in support of the arrest warrant, to the initial complaint. Thus, the Second Circuit examined a far more robust record on the motion for judgment on the pleadings than one would normally expect. It follows that the Second Circuit's decision, although made in a different procedural context, is thus highly relevant to the instant motion. The parties agree that the only additional material evidence before this Court that the Second Circuit did not consider when it issued its decision is the interview of Dr. Pourkavoos. The

denials Dr. Pourkavoos made in that interview, however, only serve to further highlight the genuine disputes of material fact as to whether it was objectively reasonable for Detective Espinoza to believe that probable cause existed.

For similar reasons, this Court also cannot find, as a matter of law, that officers of reasonable competence could disagree on whether the probable cause test was met. Again, the Second Circuit's decision is persuasive. Based on the allegations of the complaint and the robust record that was before it at the time, the Second Circuit held that no reasonably competent officer could have concluded, based on the facts known at the time of the arrest, that probable cause existed. *See Pourkavoos,* 823 F. App'x at 62 (citing *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)). In concluding that "Espinoza's conduct does not meet even that low bar," *Pourkavoos*, 823 F. App'x at 62, the Second Circuit went on to say that "no competent officer would have 'improperly included his subjective beliefs,' as the District Court observed that Espinoza did, based on 'discrepancies between the patients' recorded statements and their written statements as recited in the warrant application.'" *Id.* This Court agrees. Based on the record now before this Court, which includes Dr. Pourkavoos' interview, the Court has found that Detective Espinoza made omissions and misrepresentations in the warrant affidavit, including by inserting his subjective beliefs about Dr. Pourkavoos' interactions with the Patients into it. The jury could conclude that those omissions and misrepresentations were material to the judge's determination that the affidavit provided probable cause to arrest Dr. Pourkavoos; that is, it could find that, without those omissions and misrepresentations, the affidavit lacked probable cause. Those factual findings will have bearing on the question of whether officers of reasonable competence could disagree about whether probable cause existed. Therefore, drawing all reasonable inferences in favor of Dr. Pourkavoos, as the Court must at this stage, the Court cannot conclude as a matter of

law, that officers of reasonable competence could disagree on whether the probable cause test was met.

## 2. Clearly Established Law

Next, the Court must determine whether Detective Espinoza's actions violated clearly established law. The Court need spend very little time on this argument. Defendants argue that "research has revealed no Supreme Court or Second Circuit decision involving a warrant application under similar facts and circumstances, regarding similar charges against a physician, which established that the Fourth Amendment required Detective Espinoza to take the investigative steps plaintiff[s] wanted him to before establishing probable cause." ECF No. 117 at 39. This precise argument has already been rejected, nearly word for word, by the Second Circuit, in this very case. *Pourkavoos*, 823 F. App'x. at 61 ("Espinoza's articulation of the legal standard, in which he would require a case that 'involv[es] a warrant application under similar facts and circumstances, regarding similar charges against a physician' to show 'clearly established law,' is far too narrow." (internal citations omitted)); *see also White v. Pauly*, 580 U.S. 73, 79 (2017) ("While this Court's case law do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." (internal citations and quotations omitted)).

Further, the Second Circuit was crystal clear when it noted "our precedent establishes, and it should come as no surprise, that officers may not knowingly omit information likely to influence a judge or a prosecutor's probable cause determination." *Pourkavoos*, 823 F. App'x at 61. Defendants point to no reason why the Second Circuit's prior holding in this very case should not control this question, and the Court can discern none. Therefore, if Detective Espinoza knowingly omitted important information or knowingly misrepresented information in an effort to influence

a judge or prosecutor's probable cause determination, that was a violation of clearly established law.  There is at least a question of material fact as to Detective Espinoza's intentions in writing the warrant applications in the manner that he did; but should a jury find that he acted knowingly or recklessly in omitting and misrepresenting information to the judge who signed the warrants, these actions would violate clearly established law.  Therefore, Detective Espinoza is not entitled to summary judgment based on qualified immunity at this stage of the proceedings.

## V.      COUNT TWO:  NEGLIGENCE

Having found that disputed questions of material fact preclude summary judgment on Plaintiffs' federal constitutional claim, the Court now turns to Plaintiffs' state law claims.  First, Defendants argue that Plaintiffs' claim for negligence should be dismissed because it was filed after the statute of limitations had expired and that, even were it timely filed, it should be dismissed as barred by governmental immunity.

### A.   Statute of Limitations

Defendants contend that Plaintiffs' claim for negligence should be dismissed at the threshold for failure to file prior to the expiration of the statute of limitations.  The relevant statute of limitations is Conn. Gen. Stat. § 52-584, which provides that any action for injury caused by negligence shall be brought "within two years of the date the injury is first sustained, discovered, or should have been discovered," but in no case shall it be "brought more than three years" after the complained of conduct took place.

The Connecticut Supreme Court has made clear that Conn. Gen. Stat. § 52-584 contains two separate provisions limiting the time in which a negligence claim can be brought.  First, "the limitation period for actions in negligence begins to run on the date when the injury is first discovered or in the exercise of reasonable care should have been discovered." *Lagassey v. State*,

846 A.2d 831, 846 (Conn. 2004).   For purposes of this provision, which is referred to as the discovery portion of the statute of limitations, *Rosato v. Mascardo*, 844 A.2d 893, 899 (Conn. App. 2004), injury has been interpreted to mean actionable harm.   *Lagassey*, 846 A.2d at 846.   This occurs when "the plaintiff discovers, or in the exercise of reasonable care, should have discovered the essential elements of a cause of action."   *Id.* at 846–47.   Once this happens, a party has two years to bring a negligence claim.

The second provision of the statute provides that "no action may be brought more than three years from the date of the act or omission complained of."   Conn. Gen. Stat. § 52-584.   This section categorically "bars the bringing of suit more than three years after the alleged negligent conduct of a defendant regardless of when a plaintiff discovers the proximate cause of his harm or any other essential element of a negligence cause of action."   *Barrett v. Montesano*, 849 A.2d 839, 844 (Conn. 2004).   This second clause is often referred to as the repose section of the statute of limitations.   *Id.*

Here, although the briefing is somewhat unclear, Dr. Pourkavoos appears to admit that he was aware of the allegedly negligent conduct giving rise to this cause of action no later than January of 2014.   Specifically, the briefing states that Dr. Pourkavoos was arrested on January 22, 2014; that his criminal case was dismissed on September 27, 2016; and that the instant action was brought January 18, 2017.   Plaintiffs then assume the two-year statute of limitations applies, arguing that while this case was brought more than two years from the initial arrest, the statute of limitations was tolled by the continuing course of conduct doctrine until the dismissal of the criminal cases on September 27, 2016.   As Plaintiffs do not argue that there were any essential elements of their claim that occurred after January 22, 2014, the Court will assume their claim was ripe and that Plaintiffs were aware of their claim as of that date.   Thus, Plaintiffs' claim was

required to be filed within two years of January 22, 2014, *see Lagassey*, 846 A.2d at 843, unless the two-year period was tolled.

The Court concludes that the continuing course of conduct doctrine does not operate to toll the two-year statute of limitations.  Although neither party has pointed to this authority, appellate courts in Connecticut have repeatedly held that the continuing course of conduct doctrine applies only to the three-year repose section of the statute and is simply inapplicable when the two-year discovery portion is at issue. *See, e.g.*, *Wojtkiewicz v. Middlesex Hosp.*, 60 A.3d 1028, 1031 (Conn. App. 2013) (recognizing that once the plaintiff has discovered his injury, the statute begins to run and is not tolled); *Mollica v. Toohey*, 39 A.3d 1202, 1207 (Conn. App. 2012) (noting that "the continuing course of conduct doctrine has no application after the plaintiff has discovered the harm"); *Rosato*, 844 A.2d at 899 (same); *cf. Neuhaus v. DeCholnoky*, 905 A.2d 1135, 1143 (Conn. 2006) (holding that the repose provision of § 52-584 may be tolled under the continuing course of conduct doctrine and contrasting this holding with the inapplicability of tolling to the two-year discovery provision).  Here, Dr. Pourkavoos knew of his injury, and thus each essential element of the negligence cause of action, no later than January 22, 2014.  Therefore, any claim for negligence was required to be filed no later than January 22, 2016.  *See Wojtkiewicz*, 60 A.3d at 1031; *Mollica*, 39 A.3d at 1207; *Rosato*, 844 A.2d at 899.  As this action was commenced on January 18, 2017, Dr. Pourkavoos' claim for negligence is time-barred and Defendants are entitled to summary judgment on Count Two.  As Defendants are entitled to summary judgment based on the statute of limitations, the Court need not, and does not, reach Defendants' argument related to governmental immunity.

B. <u>Malicious Prosecution</u>

The Court will briefly address Plaintiffs' alternative argument that it should allow the negligence claim to proceed as a claim for malicious prosecution. Stated simply, Plaintiffs argue that it is not the label on a cause of action that determines the propriety of that action, but, rather, the factual allegations underlying the cause of action. Plaintiff continues that here, the complaint adequately alleges a cause of action for malicious prosecution, despite being labeled as a negligence cause of action. As malicious prosecution has a three-year statute of limitations pursuant to Connecticut General Statutes § 52-577, commencing from the day the criminal proceedings terminated favorably, Plaintiffs argue their negligence action should be construed as a timely-filed malicious prosecution claim.

Initially, a plaintiff in an action alleging malicious prosecution under Connecticut law must show "(1) the defendant initiated or continued criminal proceedings against the plaintiff"; (2) "the criminal proceeding terminated in favor of the plaintiff"; (3) "the defendant acted without probable cause"; and (4) "the defendant acted with malice." *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009). Additionally, where, as here, a plaintiff claims to allege a malicious prosecution claim under section 1983, the plaintiff must show "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth. (NYCTA)*, 215 F.3d 208, 215 (2d Cir. 2000). Nothing in the Second Amended Complaint alleges that Dr. Pourkavoos was subjected to any post-arraignment restraint on his liberty. Thus, the operative complaint fails to state a cause of action for malicious prosecution.

Further, even if the elements of a malicious prosecution claim were pleaded in the operative complaint, it is improper for Dr. Pourkavoos to argue that the complaint states a claim for malicious prosecution for the first time in opposition to Defendants' motion for summary judgment. A

plaintiff "may not assert a claim for the first time in opposition to a motion for summary judgment." *Vitti v. Macy's Inc.*, 758 F. App'x 153, 158 (2d Cir. 2018) (summary order); *see Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (holding that the district court properly dismissed a claim first raised in opposition to a motion for summary judgment without considering the merits of that claim). Given that Dr. Pourkavoos has been proceeding with counsel throughout this case and that a malicious prosecution claim has never been proposed until nearly five years into the litigation, the Court finds no need to allow such a belated argument.

For these reasons, Plaintiffs' complaint does not adequately state a claim for malicious prosecution, and the Court will not allow Count Two to continue under such a theory. Defendants' motion for summary judgment is granted as to Count Two, and it is dismissed as barred by the statute of limitations.

## VI.    COUNT THREE: INDEMNIFICATION AGAINST TOWN OF AVON

Defendants next argue that Plaintiffs' claim for indemnification in Count Three must fail based on Plaintiffs' failure to comply with the requirements of Conn. Gen. Stat. § 7-465. Specifically, § 7-465 provides that a "town, city, or borough, . . . shall pay on behalf of any employee of such municipality . . . all sums for which such employee becomes obligated to pay" based on an infringement of "any person's civil rights." It also requires, however, that, in order to bring an action under this section, a potential plaintiff must file "written notice of the intention to commence such action and of the time when and the place where the damages were incurred . . . with the clerk of such municipality within six months after such cause of action has accrued." Conn. Gen. Stat. § 7-465(a).

Plaintiffs do not plead, nor argue in opposition to summary judgment, that they gave the clerk the notice required by statute. Connecticut trial courts regularly find that the failure to plead

that adequate notice was given to the clerk requires dismissal of claims under § 7-645. *See Binkoski v. Spaulding*, No. CV126026967S, 2013 WL 7150059, at *3 (Conn. Super. Ct. Jan. 14, 2013) ("in order to satisfy the elements of [a § 7–465] claim, the plaintiff must plead that . . . he has satisfied the notice requirements of the statutory claim"); *Chirieleison v. Lucas*, No. X08FSTCV095012844S, 2011 WL 1408586, at *10 (Conn. Super. Ct. Mar. 16, 2011) (same); *Jones v. City of Hartford*, No. CV 950556220, 1996 WL 745858, at *3 (Conn. Super. Ct. Dec. 17, 1996) (same); *Santiago v. City of New Britain*, 598 A.2d 373, 374 (Conn. Super. Ct. 1991) (same).

In an effort to save their claim, Plaintiffs argue that they commenced the instant action within six months of the accrual of the constitutional claims and subsequently served notice of the present action on the clerk of the Town of Avon, thus satisfying the notice requirement. ECF No. 128 at 48.[17] This argument is incorrect. In order to determine whether notice is sufficient, the Court must look to the purpose of the statute. *Pratt v. Town of Old Saybrook*, 621 A.2d 1322, 1325 (Conn. 1993). Section 7-465 requires that notice be given of the potential litigant's "intention to commence" an action. This is consistent with the Connecticut Supreme Court's opinion that "statutory notice assists a town in settling claims promptly in order to avoid the expenses of litigation and encourages prompt investigation of conditions that may endanger public safety, as well as giving the town an early start in assembling evidence for its defense against meritless claims." *Pratt*, 621 A.2d at 1325. Once an action is commenced, the municipality is forced to defend the action and will not get any of the benefits that would attend notice of a plaintiff's intent to file suit. Accordingly, as the Connecticut Superior Court has found in a similar case, Dr. Pourkavoos' "alternative argument that the complaint was served within six months after the cause of action accrued," and thus satisfies the notice requirement set forth in § 7-465, is incorrect.

---

[17] As the Court has already found Plaintiffs' claims for negligence are time-barred, it will not address Plaintiffs' argument as to why they have satisfied the notice requirement for indemnification related to those claims.

*Gomez-Perez v. Bridgeport Police Dep't*, No. CV196082893S, 2020 WL 2616689, at *3 (Conn. Super. Ct. May 4, 2020).

Since Dr. Pourkavoos failed to provide the Town of Avon with the statutorily required notice of intent to commence suit, his claim for indemnification fails as a matter of law, and Defendants are entitled to summary judgment on Count Three.

## VII.   COUNT FOUR:  LOSS OF CONSORTIUM

Finally, Defendants argue that since Count Four relies on a finding of liability on one of the first three counts, and each of those counts fails, Count Four must also fail.  Plaintiffs do not counter Defendants' contention that Count Four rises and falls with the outcome of the other counts.  Specifically, "because a consortium action is derivative of the injured spouse's cause of action, the consortium claim would be barred when the suit brought by the injured spouse has been terminated by settlement or by an adverse judgment on the merits." *Hopson v. St. Mary's Hosp.*, 408 A.2d 260, 264 (Conn. 1979); *see also Ashmore v. Hartford Hosp.*, 208 A.3d 256, 268 (Conn. 2019) ("a derivative action such as one for loss of consortium cannot afford greater relief than would be permitted under the predicate action").  As discussed above, Dr. Pourkavoos' claim against Detective Espinoza in Count One for violations of his constitutional rights will proceed to trial, and thus Dr. Hakim-Zargar's claim for loss of consortium will also proceed as it relates to that claim only.  Because the negligence and indemnification claims alleged against the Town do not survive summary judgment and the Town will be dismissed from this action, however, the corresponding loss of consortium claim against the Town likewise cannot survive.

## VIII.  CONCLUSION

For the reasons discussed herein, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  Defendants' motion for summary judgment is denied as

to Count One and denied in part as to Count Four.  Defendants' motion for summary judgment is granted as to Counts Two and Three and granted in part as to Count Four.  As summary judgment has been granted on all counts naming the Town of Avon, the Clerk of Court is directed to remove it as a defendant in this case.

The Court will schedule a status conference with the parties to select dates for pre-trial submissions and jury selection.

**SO ORDERED** at Hartford, Connecticut, this 10th day of March, 2023.

 */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE